# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AXAR MASTER FUND, LTD. AND MAN GLG SELECT OPPORTUNITIES MASTER LP, | **CIVIL ACTION NO.** |
| | **COMPLAINT** |
| Plaintiffs, | |
| v. | |
| | **JURY TRIAL DEMANDED** |
| BRYAN K. BEDFORD, JOSEPH P. ALLMAN, NEAL S. COHEN,  ROBERT L. COLIN, DANIEL P. GARTON, AND MARK L. PLAUMANN, | |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................ 2

II.     JURISDICTION AND VENUE ........................................................................ 8

III.    PARTIES ............................................................................................................. 9

        A.      Plaintiffs ................................................................................................. 9

        B.      Defendants ............................................................................................. 9

IV.     SUMMARY OF DEFENDANTS' FRAUD ................................................... 12

        A.      Background ........................................................................................... 12

        B.      Republic's Pilot Staffing Issues ........................................................ 14

        C.      Delta Balks at Republic's Attempts to Streamline Its Fleet of Aircraft .............. 15

        D.      Defendants Assure the Market That Republic's Codeshare Partners Are
                Cooperative and That It Has Not Breached Its Codeshare Agreements .............. 16

        E.      Republic Reaches a Tentative Agreement with the Teamsters ........................... 19

        F.      The Delta Action ................................................................................. 19

        G.      The Bankruptcy Case ......................................................................... 24

V.      DEFENDANTS' MATERIAL MISSTATEMENTS AND OMISSIONS ..................... 28

        A.      1Q15 Form 10-Q .................................................................................. 28

        B.      May 8, 2015 Earnings Call ................................................................. 29

        C.      2Q15 Form 10-Q .................................................................................. 29

        D.      August 7, 2015 Earnings Call ........................................................... 30

        E.      October 7, 2015 Press Release ........................................................... 31

        F.      November 4, 2015 Press Release ....................................................... 32

        G.      3Q15 Form 10-Q .................................................................................. 33

        H.      The Bedford Declaration ................................................................... 35

VI.     DEFENDANTS HAD A DUTY TO DISCLOSE REPUBLIC'S POTENTIAL
        LIABILITY IN THE DELTA ACTION ......................................................... 36

VII.    SCIENTER ....................................................................................................... 38

VIII.   PROXIMATE CAUSE ..................................................................................... 41

IX.     NO SAFE HARBOR ........................................................................................ 43

X.      CONTROL PERSON ALLEGATIONS/GROUP PLEADING ...................... 43

XI.     CAUSES OF ACTION ..................................................................................... 45

XII.    PRAYER FOR RELIEF ................................................................................... 49

XIII.   JURY DEMAND ........................................................................................................... 50

Plaintiffs Axar Master Fund, Ltd. ("Axar") and Man GLG Select Opportunities Master LP ("Man GLG") (collectively, "Plaintiffs"), are investment funds that purchased the common stock of Republic Airways Holdings, Inc. ("Republic" or the "Company"). Plaintiffs, through their undersigned counsel, bring this action under Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act") and under the common law of the State of New York, to recover the value of the equity of which they have been deprived because of misconduct by the following Defendants: (i) Bryan K. Bedford ("Bedford"), Chairman of the Republic Board of Directors (the "Board") and Republic's President and Chief Executive Officer ("CEO"); (ii) Joseph P. Allman ("Allman"), Republic's Senior Vice President and Chief Financial Officer ("CFO"); (iii) Neal S. Cohen ("Cohen"), Lead Independent Director of the Board; (iv) Robert L. Colin ("Colin"), Director and Chairman of the Board's Audit Committee; (v) Daniel P. Garton ("Garton"), Director and member of the Board's Audit Committee; and (vi) Mark L. Plaumann, Director and member of the Board's Audit Committee (collectively, "Defendants"). Plaintiffs base their Complaint upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters.

Plaintiffs' information and belief is based upon, *inter alia*, an investigation undertaken by Plaintiffs' counsel, which included, but was not limited to, the review and analysis of: (i) Republic's public filings with the United States Securities and Exchange Commission ("SEC"); (ii) public reports and articles about Republic; (iii) Republic's press releases; (iv) transcripts of Republic's conference calls with securities analysts and investors; and (v) the court filings in the matters captioned *In re Republic Airways Holdings Inc.*, Case No. 16-10429-shl (Bankr. S.D.N.Y) (the "Bankruptcy Case"), *Delta Air Lines, Inc. v. Republic Airways Holdings, Inc.*, Civil Action Number 1:15-cv-03839-LMM (N.D. Ga.) (the "Delta Action"), and *Teamsters*

*Local Union No. 357 v. Republic Airlines, Inc.*, Civil Action No. 1:15-cv-1066-WTL-MJD (S.D. Ind.).   Many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their custody and/or control.   Plaintiffs believe that additional evidentiary support will exist for the allegations herein after Plaintiffs have had a reasonable opportunity to conduct discovery.

## I.   INTRODUCTION

1.       Republic is a regional airline incorporated in Delaware, with its principal place of business in Indianapolis, Indiana.   The Company carries passengers for United Airlines, Inc. ("United"), Delta Air Lines, Inc. ("Delta"), and American Airlines Group, Inc. ("American") pursuant to what are known as codeshare agreements.   Republic provides airline service through its wholly-owned operating air carrier subsidiaries, Shuttle America Corporation ("Shuttle America") and Republic Airline Inc. ("Republic Airline").   Under the Delta, United, and American codeshare agreements, Republic owns and operates aircraft, but those aircraft bear the names of Delta, United, and/or American (the "Codeshare Partners"), and the passengers that they carry make their reservations through one of those airlines and would generally believe that they are passengers of one of the Codeshare Partners.   Pursuant to its codeshare agreements, Republic carries nearly 3.5 percent of all air passengers in the United States.

2.       Beginning in late 2014 to early 2015, Republic, because of new regulations regarding pilot qualifications and a long-running dispute with its pilots union, the International Brotherhood of Teamsters ("Teamsters"), began experiencing a shortage of qualified pilots, which impaired its ability to provide crewed aircraft for a material portion of the flights that it was obligated to operate on behalf of its Codeshare Partners.   Because the entirety of Republic's revenue was dependent upon the provision of services to its Codeshare Partners, the Company's

inability to fulfill its contractual obligations to these partners was of paramount importance to its investors.

3.      Recognizing the importance to investors of Republic's relationships with its Codeshare Partners, between May 2015 and at least November 2015, the Company's senior executives – Defendants Bedford and Allman – continually reassured the market that Republic was not in breach of any of its codeshare agreements and was working closely with its Codeshare Partners to resolve any issues caused by the shortage of pilots.  They also told investors that Republic was in negotiations with the Teamsters with the goal of entering into a labor agreement that would allow the Company to rectify the pilot shortages it was experiencing.  Meanwhile, however, Defendants failed to disclose that the Codeshare Partners could have, or, indeed, had asserted claims against Republic related to Republic's inability to fulfill its contractual requirements.

4.      As part of the process of resolving the Company's pilot issues, Defendants also assured investors that Republic would streamline its fleet of aircraft by discontinuing the use of two classes of smaller aircraft, which would allow it to operate more efficiently and reduce its need for pilots.  Defendants claimed that the Codeshare Partners on whose behalf Republic utilized these aircraft (ERJ-145 aircraft for Delta and Q400 aircraft for United) were working with the Company to allow it to phase out its use of these aircraft beginning in 2016.[1]  Defendants indicated that after the phase-out, Republic would operate only ERJ-170/175 aircraft built by Embraer, which carry between 69 and 80 passengers.  Yet Defendants never told

---

[1]      The ERJ-145 is a 50-seat twin-engine regional jet aircraft built by Embraer S.A., a Brazilian aircraft manufacturer.  The Q400 is a twin-engined, medium-range, turboprop airliner.  The Q400's predecessors were introduced by de Havilland Canada (DHC) in 1984, and are now produced by Bombardier Aerospace.  The Q400 can carry up to 78 passengers.

investors about Republic's potential liability for damages associated with this phase-out of aircraft.

5.      Plaintiffs are sophisticated investors who fully understood Republic's business model and the importance to its future prospects of its relationships with its Codeshare Partners. They also understood that Republic's ability to streamline its fleet was critical to improving its operational efficiency and resolving its pilot staffing issues.  Thus, Plaintiffs paid close attention to, and specifically relied upon, Defendants' statements that Republic:  (i) was working closely with its Codeshare Partners in connection with its pilot staffing issues; (ii) had no significant issues with those partners; (iii) was not in breach of any codeshare agreements; and (iv) would have the Codeshare Partners' support in its attempts to streamline its fleet.  As a result of their reliance upon Defendants' statements regarding Republic's relationships with its Codeshare Partners, between late July 2015 and late February 2016, Plaintiff Axar purchased more than 10 million shares of Republic common stock, and Plaintiff Man GLG purchased more than 3.1 million shares of Republic common stock, for a combined total of approximately 30 percent of Republic's outstanding equity.

6.      Defendants' emphatic reassurances that Republic was maintaining strong relationships with its Codeshare Partners and was not in breach of any of its codeshare agreements (notwithstanding the issues created by the pilot shortage) induced Plaintiffs to believe that the only significant concern with Republic was its ability to resolve its labor issues with the Teamsters – which Plaintiffs highly expected would occur.  This expectation was justified on September 28, 2015, when Republic and the Teamsters struck a bargain that would allow Republic to begin the process of addressing its pilot shortage issues.

7.     In light of Defendants' numerous representations regarding the amicable status of Republic's relationships with its Codeshare Partners, and the resolution of its labor issues with the Teamsters, Plaintiffs were surprised when Republic announced on October 7, 2015 that it had been sued on October 5, 2015 by its Codeshare Partner, Delta for breach of contract. Defendants, however, immediately reassured investors, such as Plaintiffs, by "confirming" that Republic was "not in breach of any of its capacity purchase [codeshare] agreements with any of its mainline partners," including Delta.  Because the public complaint in the Delta Action was very heavily redacted, Plaintiffs had no reason to doubt Defendants' statements.  Weeks later on November 5, 2015, in connection with Republic's quarterly reporting to the SEC, Defendants further reassured investors regarding the Delta Action that ***"[w]e believe the allegations are*** ***<u>unfounded and without merit</u> and intend to pursue our rights, remedies and defenses in the*** ***litigation.***"

8.     Based upon Defendants' reassurances regarding the Delta Action, and their corresponding failure to indicate that any issues existed with Republic's other Codeshare Partners, Plaintiffs continued to purchase Republic shares into 2016.

9.     On February 25, 2016, Republic unexpectedly announced that it had filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York.  In connection with that filing, Defendant Bedford explained that the existence of the Delta Action was making it impossible for Republic to complete its negotiations with its Codeshare Partners to resolve issues related to its pilot shortage, increased revenue rates, and fleet-restructuring plans.  However, Defendant Bedford continued to claim that "***there was <u>no merit</u> to Delta's lawsuit***."  As a result, Axar purchased some additional shares of Republic on February 25-26, 2016.

10.     At the time of the Company's bankruptcy filing, Plaintiffs owned approximately 30 percent of Republic common stock.   In connection with Republic's initial filing in the Bankruptcy Case, Defendant Bedford declared that Republic had stockholders' equity of $590 million.

11.     Given the disclosures (and omissions) in Republic's public SEC filings, the amount assigned by Defendant Bedford to the Company's equity, and Defendants' statements regarding the Delta Action as "unfounded and without merit," Plaintiffs were stunned on March 24, 2016, when Republic revealed that it faced significant and known potential liability of ***more than $1 billion in damages*** on Delta's claims, and that it had agreed to settle those claims by granting Delta a ***$170 million unsecured claim*** in the Bankruptcy Case that would be prioritized over the interests of Republic equity holders, including Plaintiffs.

12.     Plaintiffs were further stunned on May 27, 2016, when Republic announced that it had reached a settlement agreement with United that granted United a $193 million general unsecured claim in the Bankruptcy Case.   Republic subsequently submitted sworn testimony from Defendant Allman and Ginger Hughes ("Hughes"), the Managing Director at Seabury Corporate Advisors, LLC ("Seabury"), which had been engaged by Republic to provide investment banking and financial advisory services in connection with its restructuring and was involved in its negotiations and discussions with the Codeshare Partners regarding potential amendments to its codeshare agreements.   Both Defendant Allman and Hughes asserted that the settlement was in Republic's best interest because United possessed a claim for hundreds of millions in damages based on Republic's past underperformance and projected future failure to perform under its codeshare agreement and was more likely than not to prevail if it were to litigate that claim.   This was particularly shocking because neither Republic nor Defendants had

ever before publicly disclosed that United had any claim against Republic.  Instead, Defendants had represented for more than a year that Republic was working with its Codeshare Partners (including United) to cooperatively resolve issues related to the pilot shortage and the streamlining of its fleet.  As it turns out, and unbeknownst to investors, Republic had been negotiating for many months to resolve United's significant damages claim for Republic's breach of its codeshare agreement, despite Defendant Bedford stating publicly that Republic was "not in breach of any of [its] agreements" with its Codeshare Partners.

13.     Finally, on September 2, 2016, Republic announced that it had entered into a settlement agreement with American to resolve American's claims against Republic arising, at least in part, from Republic's breaches of the American Agreements prior to Republic's bankruptcy filing on February 25, 2016.  According to American, these claims have a value of at least $433 million.

14.     Pursuant to its settlement agreement with American, Republic granted American unsecured claims in the Bankruptcy Case of at least $250 million, and to the extent that total claims against Republic in that proceeding were to exceed $1 billion, American's claim amount would increase, so that at all times, its claims would represent 25 percent of total claims in the Bankruptcy Case.

15.     As was the case with both the Delta and United settlements, the American settlement was a surprise to Plaintiffs because of Defendants' pre-petition statements that they were not in breach of any contractual agreements with the Codeshare Partners and were working cooperatively with those partners to resolve issues related to the pilot shortage.  It was also surprising because Defendants had never before disclosed the existence (or even possibility) of claims by American against Republic.

7

16.     Republic's grants of unsecured claims to Delta in the amount of $170 million to settle the Delta Action, United in the amount of $193 million to resolve its unasserted claims, and American in the amount of $250 million to resolve its unasserted claims, have completely eliminated the value of Plaintiffs' existing investments in Republic and expected recoveries in the Bankruptcy Case.

17.     Plaintiffs therefore assert three causes of action to recover the substantial investment losses they have suffered as a result of Defendants' materially false and misleading statements and omissions of material fact regarding Republic's breach of its codeshare agreements with the Codeshare Partners and known, substantial liabilities arising therefrom against: (i) Defendants Allman and Bedford under Section 10(b) of the Exchange Act (Count I); (ii) all Defendants under Section 20(a) of the Exchange Act (Count II); and (iii) Defendants Allman and Bedford under state common law fraud (Count III).

## II.    JURISDICTION AND VENUE

18.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and under state common law.

19.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, and has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

20.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391.  Many of the acts giving rise to the violations complained of herein, including the dissemination of false and misleading information, occurred in this District.

21.     In connection with the acts, transactions, and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but

not limited to, the United States mails, interstate telephone communications, and the facilities of a national securities exchange and market.

### III.   PARTIES

#### A.   PLAINTIFFS

22.   Plaintiff Axar is a Cayman Islands company.  Between August 8, 2015 and February 26, 2016, in reliance upon numerous statements by Defendants that were subsequently shown to be false, Axar purchased more than 10 million shares of Republic.

23.   Plaintiff Man GLG is a Cayman Islands exempted limited partnership.  Between July 27, 2015 and February 24, 2016, in reliance upon numerous statements by Defendants that were subsequently shown to be false, Man GLG purchased more than 3.1 million shares of Republic.

#### B.   DEFENDANTS

24.   Defendant Bedford has served as the President, CEO, and Chairman of Republic's Board at all relevant times.  As alleged herein, Defendant Bedford signed the Company's SEC filings and made public representations in the following documents and/or contexts that were materially false and misleading and/or omitted material facts:  (i) Republic's quarterly report on Form 10-Q for the first quarter ended March 31, 2015 ("1Q15") filed with the SEC on May 8, 2015 ("1Q15 Form 10-Q"); (ii) Republic's earnings conference call on May 8, 2015 (the "May 8, 2015 Earnings Call"); (iii) Republic's quarterly report on Form 10-Q for the second quarter ended June 30, 2015 ("2Q15") filed with the SEC on August 7, 2015 ("2Q15 Form 10-Q"); (iv) Republic's earnings conference call on August 7, 2015 (the "August 7, 2015 Earnings Call"); (v) Republic's quarterly report on Form 10-Q for the third quarter ended September 30, 2015 ("3Q15") filed with the SEC on November 5, 2015 (the "3Q15 Form 10-Q"); and (vi) the

Declaration of Bryan K. Bedford Pursuant to Local Bankruptcy Rule 1007-2 filed in the Bankruptcy Case on February 25, 2016 (the "Bedford Declaration").

25.     Defendant Allman has served as Senior Vice President and CFO of Republic from August 5, 2015 through the present.  As alleged herein, Defendant Allman signed the Company's SEC filings and made public representations in the following documents and/or contexts that were materially false and misleading and/or omitted material facts:  (i) the August 7, 2015 Earnings Call; (ii) Republic's press release dated November 4, 2015 attached to its current report on Form 8-K filed with the SEC on November 5, 2015 (the "November 4, 2015 Press Release"); and (iii) the 3Q15 Form 10-Q.

26.     Defendant Cohen has served as Lead Independent Director of the Board.  As the Board's Lead Independent Director, Defendant Cohen was responsible for, among other things: (i) chairing executive sessions of the independent directors; (ii) serving as a spokesperson for the independent directors; and (iii) serving as a liaison between the Company's other independent directors and the Company's management, auditors and counsel between Board meetings.  In addition, through the Board's role in the Company's risk oversight process, Defendant Cohen: (i) received regular reports from Republic's senior management identifying and discussing areas of material risk to the Company, including operational, legal and regulatory, and strategic and reputational risks; (ii) reviewed with management its strategies, techniques, policies and procedures designed to manage these risks; and (iii) supervised management's implementation of a variety of processes, procedures and controls to address these risks.

27.     Defendant Colin has served as director of the Board and Chairman of the Board's Audit Committee.  As Audit Committee Chairman, Defendant Colin was responsible for, among other things:  (i) reviewing Republic's interim financial statements with management and the

Company's independent registered public accounting firm prior to the filing of the Company's 3Q15 Form 10-Q; (ii) reviewing and discussing with management and the internal audit department policies and guidelines to govern the process by which management assessed and managed the Company's risks, including the Company's major financial risk exposures and the steps management had taken to monitor and control such exposure; and (iii) reviewing regular reports from the Company's independent registered public accounting firm on internal controls and financial reporting matters in conjunction with the Board's review of regular reports from senior management on areas of material risk to the Company, including operational, financial, legal and regulatory, and strategic and reputational risks.

28.     Defendant Garton served as director of the Board and member of the Board's Audit Committee.  As an Audit Committee member, Defendant Garton was responsible for, among other things:  (i) reviewing and discussing with management and the internal audit department policies and guidelines to govern the process by which management assessed and managed the Company's risks, including the Company's major financial risk exposures and the steps management had taken to monitor and control such exposure; and (ii) reviewing regular reports from the Company's independent registered public accounting firm on internal controls and financial reporting matters in conjunction with the Board's review of regular reports from senior management on areas of material risk to the Company, including operational, financial, legal and regulatory, and strategic and reputational risks.

29.     Defendant Plaumann served as director of the Board and member of the Board's Audit Committee.  As an Audit Committee member, Defendant Plaumann was responsible for, among other things:  (i) reviewing and discussing with management and the internal audit department policies and guidelines to govern the process by which management assessed and

11

managed the Company's risks, including the Company's major financial risk exposures and the steps management had taken to monitor and control such exposure; and (ii) reviewing regular reports from the Company's independent registered public accounting firm on internal controls and financial reporting matters in conjunction with the Board's review of regular reports from senior management on areas of material risk to the Company, including operational, financial, legal and regulatory, and strategic and reputational risks.

30.     Defendants Cohen, Colin, Garton, and Plaumann are collectively referred to herein as the "Director Defendants."

## IV.    SUMMARY OF DEFENDANTS' FRAUD

### A.    BACKGROUND

31.     Pursuant to its fixed-fee codeshare agreements with United, Delta, and American, its three Codeshare Partners, Republic offers approximately 1,000 flights daily to 105 cities in 38 states, Canada, and the Caribbean.  Republic provides services through its wholly-owned airline carrier subsidiaries, Shuttle America and Republic Airline, and operates under the designations of United Express, Delta Connection, and American Eagle.  Republic primarily provides service out of the Codeshare Partners' respective hubs and focus cities.  With its operations concentrated in key markets in the Northeast, Mid-Atlantic, and Midwest regions of the United States, Republic provides nearly 3.5% of the total domestic industry seats.

32.     The Company principally earns its revenues by operating flights on behalf of its Codeshare Partners pursuant to its codeshare agreements.  The codeshare agreements require Republic to operate flights using specific aircraft types and to maintain specified performance levels.  The codeshare agreements also mandate minimum levels of aircraft utilization but establish fixed rates for the flights that Republic operates.  Republic is authorized to use its Codeshare Partners' two-letter flight designator codes to identify its flights and fares in the

Codeshare Partners' respective computer reservation systems, paint its aircraft in the style of the Codeshare Partners, use the Codeshare Partners' service marks, and market itself as a carrier for the Codeshare Partners.

33.     Historically, all of Republic's codeshare agreements have been fixed-fee capacity purchase agreements ("CPAs"), under which:  (i) Republic's seat capacity is purchased by a major airline partner, which provides ground support and gate access, incurs operating expenses relating to fuel, navigation, airport use, and terminal handling, and determines pricing, scheduling, ticketing, and seat inventory; (ii) Republic is responsible for the costs of labor, aircraft maintenance, safety and compliance oversight, and aircraft financing; and (iii) annual escalation provisions tied to the consumer price index (CPI), excluding fuel and food, are applied to the reimbursement amounts, which historically have been highly correlated to actual changes in regional airline costs.  Republic's codeshare agreements have benefited the Company by limiting its exposure to fluctuations in fuel prices, fare competition, and passenger volumes, while minimizing its dependence on any single airline.  The agreements allow Republic to allocate its overhead more efficiently among its Codeshare Partners, and enable it to control its cost of providing service to them.

34.     According to Republic's annual report on Form 10-K for fiscal year ended December 31, 2015 filed with the SEC on March 11, 2016, as of December 31, 2015, the Company, through Shuttle America and Republic Airline, operated four types of aircraft under its codeshare agreements, including: (i) 20 ERJ-170 aircraft and 85 ERJ-175 aircraft on behalf of American; (ii) 41 ERJ-145 aircraft, 14 ERJ-170 aircraft, and 16 ERJ-175 aircraft on behalf of Delta; and (iii) 38 ERJ-170 aircraft, 12 ERJ-175 aircraft, and 16 Q400 aircraft on behalf of United.

B.     REPUBLIC'S PILOT STAFFING ISSUES

35.     In early 2015, Republic was facing a severe pilot shortage.   The Company attributed its pilot staffing issues primarily to a growing shortage of qualified pilots in the United States due to:   (i) Congressional legislation enacted in 2010 and effective August 2013 and January 2014 increasing new pilot qualification requirements; and (ii) an aging pilot population. According to Republic, this pilot shortage resulted in greater demand for qualified pilots at mainline, low-cost and cargo carriers, which recruited from the regional airlines and offered higher salaries and more extensive benefit programs than regional carriers were able to offer. This made it increasingly difficult for regional airlines, such as Republic, to retain a sufficient number of pilots.

36.     Further stretching its available pilot resources, Republic was in the midst of protracted and intense negotiations with the labor union representing the Company's pilots, the Teamsters, to modify their collective bargaining agreement.   Over the course of this dispute, Republic had experienced unprecedented pilot attrition and frustrated recruiting efforts, as pilot wages under the agreement deteriorated substantially below the industry standard.

37.     In an attempt to address its pilot shortage issue, on February 27, 2015, Republic implemented a "premium pay" program that incentivized pilots to perform extra hours by paying captains an additional $30 per hour and first officers an additional $15 per hour when they picked up open time on a scheduled day off.   However, this strategy backfired, as the Teamsters' leaders issued their own memorandum on March 30, 2015, discouraging the Company's pilots from picking up open time.   As a result, Republic experienced an even greater level of crew cancellations in April and May of 2015.

38.     Subsequently, on July 9, 2015, the Teamsters filed a lawsuit against Republic alleging that the Company's practice of providing premium pay and hiring bonuses to pilots and

prospective new-hire pilots violated the Railway Labor Act.  The Teamsters' challenges to the Company's practice of paying higher new pilot signing bonuses and the uncertainty surrounding this litigation further undermined Republic's efforts to recruit and retain qualified pilots.

### C.   DELTA BALKS AT REPUBLIC'S ATTEMPTS TO STREAMLINE ITS FLEET OF AIRCRAFT

39.     Consolidation among the major airline carriers and historically high fuel prices rendered less economical smaller regional jets, such as Republic's 50-seat ERJ-145 aircraft and Q400 turboprops, used under its codeshare agreements with United and Delta, respectively. Therefore, one of the Company's principle business strategies was to simplify its operations down to a single aircraft type (ERJ-170/175) under a single operating certificate.  To this end, in 2014, the Company decided to retire its Q400 turboprops and expected to have them entirely removed from its fleet by 2016.  Then, in early 2015, Republic announced its plans to remove the smaller, less profitable ERJ-145 jets from its fleet over the next two years.

40.     In addition to improving operating efficiencies, Republic expected that removal of the ERJ-145 and Q400 aircraft would free up pilots that it could train on the ERJ-170/175 aircraft, allowing it to ameliorate some of the pilot shortage it was experiencing.

41.     Despite Republic's announced plans to wind down its ERJ-145 operations after May 31, 2016, when its ERJ-145 Agreement with Delta was due to expire, on February 26, 2015, Delta claimed a right to extend this agreement through May 2021.

42.     During the Company's May 8, 2015 Earnings Call, Defendant Bedford sought to portray Delta's "unexpected" extension of the ERJ-145 Agreement through May 2021 as a "positive" development, even though it conflicted with the Company's plans to improve its efficiency by limiting its operations to a single (ERJ-170/175) type of aircraft.  In particular, Defendant Bedford suggested that, despite Delta's attempt to unilaterally extend the agreement

requiring Republic to operate ERJ-145 aircraft, Delta was not committed to the ERJ-145 and would be willing to accommodate the Company's objective of reducing its operations to a single aircraft type:

> In terms of the single fleet or single certificate opportunity, that's still subject to, again, working through a *minor*, I think, *scope related issue with Delta* as a partner.  So *we're working through that right now*, and again, *I think there's collaboration there. Delta certainly understands that there's value in our fleet and operational simplification in terms of meeting their longer term needs for cost-effective reliable service.*

43.     Based upon Defendant Bedford's statements regarding Delta's cooperation, analysts remained positive that the Company was "well-positioned" to remove its smaller, out-of-favor aircraft from its fleet within the next two years.  For example, a Deutsche Bank analyst reported on July 26, 2015:

> Turning to risks, consolidation among the major carriers, which has resulted in fewer hubs, and therefore, a need for fewer regional jets to feed those hubs has negatively impacted aggregate demand for the smallest regional jets, particularly 37-50 seaters.  In that regard, we think the carriers with the weakest contracts could be susceptible – *our view is that RJET is well-positioned to deal with this, given that the majority of their fleet consists of large-gauge jets (70-76 seaters) with plans to divest of all 50-seaters by 2016/17.*

**D.     DEFENDANTS ASSURE THE MARKET THAT REPUBLIC'S CODESHARE PARTNERS ARE COOPERATIVE AND THAT IT HAS NOT BREACHED ITS CODESHARE AGREEMENTS**

44.     As a result of Republic's ongoing labor dispute, the Company could not maintain adequate pilot staffing levels to satisfy its commitments to the Codeshare Partners.  Accordingly, the Company approached its Codeshare Partners in early 2015 to discuss reducing the scheduled amount of time that its aircraft were in operation (i.e., "flying hours") under the codeshare agreements.

16

45.     Following these discussions, the Company's 1Q15 Form 10-Q filed on May 8, 2015 reported:  "We have agreed with our [Codeshare] [P]artners to reduce schedules to improve our operational performance in the second half of 2015. We continue to work with our [Codeshare] [P]artners on these issues."

46.     During the Company's May 8, 2015 Earnings Call, Defendant Bedford likewise indicated that the Codeshare Partners were amenable to Republic's requests to reduce its scheduled flying hours under the codeshare agreements:  "[W]e have asked our partners to reduce our levels of flying this summer.  ***Thankfully, we're getting their support***.  ***We're grateful to our partners for their collaboration, working with us*** during this challenging period."

47.     In response to these assurances, an Imperial Capital analyst wrote on July 30, 2015:

> ***RJET's contract partners . . . are likely to be supportive as the company works towards an agreement, in our opinion.***  We believe that Republic likely held conversations with its contract partners . . . ahead of its recent earnings pre-announcement and ***expect that all partners will remain supportive***.  With other regional carriers facing their own challenges, ***it is unlikely we see previously announced RJET flying contracts reevaluated by mainline partners.***

48.     The Company's labor dispute persisted, however, forcing Republic to request additional relief from its Codeshare Partners, as it disclosed in its 2Q15 Form 10-Q filed on August 7, 2015:  "The Company has initiated discussions with its [Codeshare] [P]artners to further reduce flying schedules during the second half of 2015 and early 2016."

49.     The Company's need to further reduce its flying schedules raised concerns from analysts over Republic's performance under the codeshare agreements, as reflected in the following exchange with Defendants during Republic's August 7, 2015 Earnings Call:

**Mike Linenberg** - Deutsche Bank - Analyst
Okay. Very good. My second question is just having seen your contracts in the past, I assume based on your performance of late that you would be in breach of those contracts and knowing that there is a period to cure that potential breach and of course, working with [Seabury] and all your partners you're currently trying to address that, but have many of your major carriers or major partners held back any cash that – you're owed at the end of the period?

**Bryan Bedford** - Republic Airways - Chairman, President, CEO
Well, let's clear up the – the potential misconception, Mike. *We are not in breach on any of our agreements. We're not in default under any of the operational, given the fact that we believe [sic] able to reach consensual understandings with the partners on some operational reductions over the course of the summer.*

\*     \*     \*

**Mike Linenberg** - Deutsche Bank - Analyst
Okay. And then has any partner held back – sometimes I know they can be slow in paying or are you sort of everything is up – everything is copacetic as it relates to receiving payments from your major carrier partners.

**Joe Allman** - Republic Airways - CFO
Good question, Mike. This is Joe. No. *Everybody has been performing under the contract.*

50.     Based upon Defendants' representations, Deutsche Bank analyst Mike Linenberg reported that same day: "Regarding Republic's contracts with its major partners, *the company is not yet in breach as management was able to negotiate reduced operating commitments and all payments are up-to-date.*" However, in contrast to Defendant Allman's statement quoted above and relied upon by a sell-side analyst, in fact, everybody had not been performing under the contract. As later disclosed in the Company's 3Q15 Form 10-Q, through September 30, 2015, Delta had withheld "in excess of $10 million of contractual payments."

18

E.     **REPUBLIC REACHES A TENTATIVE AGREEMENT WITH THE TEAMSTERS**

51.     On August 21, 2015, Republic submitted its "last, best, and final offer" to the Teamsters on a proposed three-year agreement and issued an online letter to the Teamsters threatening that their rejection of its proposal would force the Company to consider "non-consensual restructuring."  In an interview with *Bloomberg* published that same day, Republic's Vice President of Human Resources, Mike Koscal clarified that while the Company wanted to secure an agreement with the Teamsters, it was prepared in the alternative to seek a court-supervised restructuring under Chapter 11.

52.     A month later, on September 28, 2015, the Company revealed what appeared to be a long-term solution to its staffing problems when it announced that it had finally reached a tentative agreement with the Teamsters on a three-year contract.

53.     Investors celebrated this news, as Republic's share price soared 82% after the Company's announcement.  In particular, according to a *Bloomberg* article published that same day, Republic's "tentative agreement with its pilots union . . . *eases concerns of a possible bankruptcy filing*."  Similarly, a Cowen & Co. analyst commented in response to the announced deal that "*[b]ankruptcy is clearly off the table*."

F.     **THE DELTA ACTION**

54.     Contrary to Defendants' continual assurances that the Company's Codeshare Partners remained cooperative, Delta (unbeknownst to Plaintiffs) was unwilling to accommodate Republic's requests for a reduction in its scheduled operations and had taken the position that the Company was in breach of its contracts.

55.     Specifically, Republic, through Shuttle America, had entered into various codeshare agreements with Delta as part of the Delta Connection regional air carrier program,

which connects Delta's "hub" airports to outlying "spoke" airports in smaller cities that do not generate sufficient demand to support the operation of the larger aircraft operated in Delta's own fleet.   These codeshare agreements included a June 7, 2002 Delta Connection Agreement governing Shuttle America's operation of 41 ERJ-145 aircraft (the "ERJ-145 Agreement"), and a June 13, 2005 Delta Connection Agreement governing Shuttle America's operation of fourteen ERJ-170 aircraft and sixteen ERJ-175 aircraft (the "ERJ 170/175 Agreement" and, together with the ERJ-145 Agreement, the "Delta Connection Agreements").

56.     On or about January 13, 2015, Republic made a presentation to Delta, in which it asserted that, beginning in 2015, it would no longer operate a full schedule of flights under its ERJ-145 Agreement and that its operational limit on the amount of time that its aircraft were in operation would not be able to achieve the levels contemplated under the ERJ-145 Agreement.

57.     Delta rejected Republic's January 2015 plan to unilaterally reduce the number of ERJ-145 flights it planned to operate under the ERJ-145 Agreement.   In Delta's view, the ERJ-145 Agreement did not excuse Republic's performance due to an inadequate number of pilots, but rather, expressly required the Company to maintain adequate staffing levels at all times.

58.     In April 2015, Republic also demanded a significant reduction in scheduled flying hours under its ERJ-170/175 Agreement for the months of June, July, and August 2015.

59.     Delta similarly rejected Republic's demand to reduce flying hours under its ERJ-170/175 Agreement due to inadequate pilot staffing, claiming that Republic was in breach of that agreement's requirement that the Company maintain adequate pilot staffing levels at all times.

60.     As Republic's pilot staffing deficiencies persisted, it told Delta that it would have to ground a portion of its ERJ-170/175 fleet to accommodate its inability to staff those aircraft.

61.     None of these discussions between Republic and Delta regarding Republic's inadequate staffing was publicly disclosed to Plaintiffs or other investors.

62.     In addition, in August 2015, Republic informed Delta that it would not place at least two of nine additional ERJ-170 aircraft into service, as required under an amendment to the ERJ-170/175 Agreement.  While Republic made clear to Delta that it would breach its ERJ-170/175 Agreement, Defendants conversely represented to investors that the Company was not in breach of any of its agreements, including its two Delta Connection Agreements.

63.     Due to Republic's failures to perform under the Delta Connection Agreements, which threatened to interrupt Delta's operations and inconvenience its passengers, Delta was left with no other choice but to significantly reduce Republic's flying hours in order to protect the reliability of its flight schedules.

64.     Following unsuccessful attempts to resolve these issues amicably, on October 5, 2015, Delta filed a lawsuit against Republic alleging that the Company had breached its Delta Connection Agreements.  In its complaint, Delta estimated that its damages would "exceed $1 million" as a result of Republic's past and future pilot staffing inadequacies, which had caused Delta to cancel flights and prevented it from scheduling flights that it would have otherwise scheduled.

65.     In response to Delta's complaint, Defendants repeatedly assured investors that Delta's claims were baseless, and that Republic had not breached any of its agreements with its Codeshare Partners.  For example, two days after Delta initiated the Delta Action, Defendants caused Republic to issue a press release on October 7, 2015 ("October 7, 2015 Press Release") stating in pertinent part:

> Republic Airways Holdings Inc. (NASDAQ/NM: RJET) has been
> made aware of a complaint filed by Delta. The Company has not

been served and has not received the full complaint and therefore cannot comment further on the matter at this time.  ***Republic can confirm that the Company is not in breach of any of its capacity purchase agreements with any of its mainline partners, including both Delta Connection Agreements.***

66.     In reliance upon such assurances, Plaintiffs and other market participants reasonably continued to believe that following the Company's resolution of its labor dispute, Republic was well-positioned to address its pilot shortage issues and streamline its operations with the support of its Codeshare Partners.  For example, that same day, investment commentator the *Motley Fool* wrote in response to the October 7, 2015 Press Release:  "[A] recent tentative agreement with pilots should bring some stability to the company and its operations.  ***It was also reported that Delta's losses because of the disruption were only $1 million, so even the impact of a settlement would likely be small.***  I don't see this as a reason to run from Republic Airways today."

67.     Weeks later, in the November 4, 2015 Press Release announcing Republic's 3Q15 results, which was attached to the Company's Form 8-K publicly filed with the SEC on the following day, Defendants again disavowed Delta's allegations in the Delta Action as "***unfounded and without merit***":

> On Oct. 5, 2015, Delta Air Lines Inc. ("Delta") filed suit against the Company alleging that the Company was in breach of its contractual obligations under both Delta Connection Agreements. Delta alleges among other things, that Shuttle America breached the Agreements by failing to operate all of Delta's flights, and claims damages.  ***We believe the allegations are unfounded and without merit***.

68.     Similarly, while acknowledging for the first time that Delta had withheld some payments under the Delta Connection Agreements, Defendants again reiterated that the Delta Action was without merit in Republic's 3Q15 Form 10-Q publicly filed with the SEC on November 5, 2015:

On October 5, 2015, Delta Air Lines, Inc. (Delta) filed suit against the Company alleging that the Company was in breach of its contractual obligations under both Delta Connection Agreements. Delta alleges, among other things, that Shuttle America breached the Agreements by failing to operate all of Delta's flights, and claims damages. ***We believe the allegations are <u>unfounded</u> and <u>without merit</u> and intend to pursue our rights, remedies and defenses in the litigation.*** Delta has withheld in excess of $10.0 million of contractual payments through September 30, 2015, which has resulted in past due receivables on the Company's balance sheet. ***The Company <u>disputes</u> Delta's right to withhold payments and intends to seek their recovery.*** The Company has deferred recognition of this revenue until this dispute can be resolved.

69.    In Republic's 3Q15 Form 10-Q, Defendants also addressed claims by Delta in the Delta Action that its damages would extend through 2021 based upon Delta's extension of the ERJ-145 Agreement, disputing that any such valid extension had occurred:

On February 26, 2015, Delta Air Lines purported to exercise a right to extend aircraft under the E145 codeshare agreement from May 2016 to May 2021. ***The Company <u>disputes</u> the validity of the purported extension, which is contrary to the parties' previous communications and understanding.*** As the agreement does not contain any terms for an extension period, any such purported extension would be subject to mutual agreement on rates, terms, and conditions. ***No such mutual agreement has been reached and the Company believes that Delta has not made any good-faith efforts to engage in such discussions. <u>Absent such an agreement it would expire by its terms on May 31, 2016.</u>***

70.    While Defendants' statements unequivocally denying the merits of Delta's claims and disputing the validity of Delta's extension of the ERJ-145 Agreement misled Plaintiffs to believe that Republic's potential liability in the Delta Action was limited to a period ending in March 2016, in truth, Defendants understood from their extensive negotiations with Delta that a favorable outcome for Republic in the Delta Action was far from likely, and that Republic was vulnerable to a massive claim in excess of $1.7 billion – or approximately three times Republic's

tangible book value – for lost profits based upon Delta's five-year extension of the ERJ-145 Agreement.

G.    **THE BANKRUPTCY CASE**

71.    On February 25, 2016, Republic filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York.   According to its filings in the Bankruptcy Case, Republic had approximately $2.98 billion in debts and $3.56 billion in assets, for a net positive equity value of $590 million as of January 31, 2016.  Despite its excess of assets over liabilities, the Company sought Chapter 11 protection in order to "right size" its business by ridding itself of uneconomical and out-of-favor aircraft, such as the ERJ-145.  As Defendant Bedford explained in a press release announcing the filing:

> Over the last several months, we've attempted to restructure the obligations on our out-of-favor aircraft – made so by a nationwide pilot shortage – and to increase our revenues.  It's become clear that this process has reached an impasse and that any further delay would unnecessarily waste valuable resources of the enterprise. Our filing today is a result of our loss of revenue during the past several quarters associated with grounding aircraft due to a lack of pilot resources, combined with the reality that our negotiating effort with key stakeholders shows no apparent prospect of a near term resolution.

72.    In the Bedford Declaration filed in the Bankruptcy Case on that same day, Defendant Bedford further explained that the Company had filed for bankruptcy because, among other reasons, "[a]lthough ***there was <u>no merit</u> to Delta's lawsuit***, unfortunately, the existence of the litigation and the uncertainty of its resolution became an impediment to reaching resolutions with the other Codeshare Partners."

73.    One month later, on March 24, 2016, Republic announced that it had agreed to settle Delta's claims for more than ***$1 billion in damages*** resulting from the Company's

24

contractual breaches by granting Delta an unsecured claim in the Bankruptcy Case in the amount of *$170 million.*  The amount of the claim was subject to upward adjustment depending on the potentially more favorable treatment of similar claims of Republic's other Codeshare Partners pursuant to a "Most Favored Nations" clause.  As Republic admitted in its motion seeking the court's approval of this agreement in the Bankruptcy Case, "[t]he proposed settlement is the product of *extensive negotiations* between Republic and Delta *that began over four months ago*."  Thus, Defendants knew or recklessly disregarded at the time of their statements affirmatively disavowing the merits of Delta's claims that, in fact, Republic had been negotiating with Delta since late October 2015, and that it faced *significant* potential liability in the Delta Action.

74.     Subsequently, Delta disclosed on April 18, 2016 in the Bankruptcy Case that "*a substantial majority*" of the estimated *$1.7 billion in damages* from Republic's contractual breaches reflected damages *post-dating* Republic's bankruptcy filing attributable to its nonperformance of the ERJ-145 Agreement.  In other words, contrary to Defendants' statements contesting the validity of Delta's extension of the ERJ-145 Agreement, such damages stemmed from Republic's breach of the ERJ-145 Agreement *through May 2021*.

75.     As also disclosed by Defendant Allman's sworn testimony in the Bankruptcy Case, by as early as August 2015, Defendants had been informed of "claims of [C]odeshare [P]artners that would arise with respect to amendments to their agreements and concessions to be made for them" and understood "that [C]odeshare [P]artners who were going to ultimately be asked to give *major* concessions would want some compensation for those concessions."

76.     Defendant Allman further admitted in the Bankruptcy Case that by no later than January 2016, Defendants were fully aware that Delta was seeking damages in the *hundreds of*

*millions of dollars* in connection with the claims in the Delta Action.  Yet, Defendants not only hid the fact that Republic faced *significant* potential liability in the Delta Action, but also publicly denied the merits of the claims giving rise to such liability.

77.     During the same period it was negotiating with Delta, unbeknownst to Plaintiffs and despite public statements that it was not in breach of its codeshare agreements, Republic also was seeking to restructure arrangements with and resolve potential claims asserted by United and American in connection with services that had been curtailed or would not be provided in the future under Republic's codeshare agreements with each of these Codeshare Partners.

78.     On May 26, 2016, Republic and United came to an agreement which, among other things, provided an unsecured claim to United in the Bankruptcy Case of *$193 million*. This claim was to reimburse United for damages it suffered as a result of Republic's shortfall in flying under its codeshare agreements with United and as consideration for future modifications to those agreements.

79.     During the course of Republic's negotiations with United over the next several months, United also asserted a claim for hundreds of millions of dollars in damages against Republic arising from Republic's past underperformance and future failure to perform under its codeshare agreements with United.   Nonetheless, though aware of such material claims, Defendants failed to provide any timely, public disclosure of them.

80.     Moreover, Republic conducted diligence on United's asserted damages claim prior to seeking the bankruptcy court's approval of its agreement with United on May 26, 2016. Based upon that assessment, the Company assigned United's claim a *50% probability of success*.

81.     Most recently, on September 2, 2016, Republic announced that it had reached a deal with American to resolve issues between the parties.   Republic and American have

disclosed that there are two agreements between the parties:  (i) a Commercial Settlement that alters the obligations between the parties going forward; and (ii) a Claim Settlement that resolves claims that American has against Republic for Republic's breach of multiple Agreements between the parties (the "Claim Settlement").  The Agreements that American claims have been breached include, but are not limited to:  (i) a Capacity Agreement and a Guarantee Agreement governing Republic's operation of E175 aircraft as American Eagle and (ii) the Republic Jet Service Agreement dated September 2, 2005 between American, as successor by merger to US Airways and Republic Airline (as amended, supplemented, or otherwise modified, governing Republic's operations of E170 and E175 aircraft as US Airways Express (now American Eagle) (collectively the "American Agreements").

82.     Pursuant to the Claim Settlement, American will have unsecured claims in the Bankruptcy Case of at least $250 million, and to the extent that total claims against Republic in that proceeding exceed $1 billion, American's claim amount will be increased, so that at all times, its claims represent 25 percent of total claims in the Bankruptcy Case.

83.     The claims by American for breach of the American Agreements are based on Republic's breach of performance and wrongful withdrawal of aircraft, for lost profits, deferred maintenance, disruption and transition costs, and costs of activation of other aircraft in the American fleet.  According to American, these claims have a value of at least $433 million (which do not include additional damages of $195 million that American has asserted it will incur as the result of changes to the American Agreements due to the Commercial Settlement).

84.     In both Republic's filing on September 2, 2016, seeking approval by the bankruptcy court of the agreements it had reached with American and in American's own proof of claims filed on August 5, 2016, it was acknowledged that the claims by American against

Republic arose, at least in part, from breaches of the American Agreements by Republic prior to Republic's filing for bankruptcy on February 25, 2016.

85.     Critically, as noted above, Defendant Allman submitted sworn testimony in the Bankruptcy Case admitting that "***as early as . . . August 2015***," he had "informed the [B]oard as to . . . claims of [C]odeshare [P]artners that would arise with respect to amendments to their agreements and concessions to be made for them" and understood "that [C]odeshare [P]artners who were going to ultimately be asked to give ***major*** concessions would want some compensation for those concessions."

86.     Moreover, in support of Republic's motion seeking authorization of the United settlement filed in the Bankruptcy Case, the Company submitted sworn testimony from Seabury's Managing Director, Ginger Hughes, who had been involved in Republic's negotiations and discussions with the Codeshare Partners regarding potential amendments to its codeshare agreements.  In her declaration, Hughes expressly acknowledged that "***Republic and United had begun negotiations in September 2015 to comprehensively restructure the parties' relationship.***"

## V.     DEFENDANTS' MATERIAL MISSTATEMENTS AND OMISSIONS

### A.     1Q15 FORM 10-Q

87.     The Company's 1Q15 Form 10-Q publicly filed with the SEC on May 8, 2015, which was signed by Defendant Bedford, stated in pertinent part:

> As a result of pilot supply constraints exacerbated by industry regulatory changes, our ongoing labor dispute and other factors, the Company's operational performance in 2015 has deteriorated. ***We have agreed with our [Codeshare] [P]artners to reduce schedules to improve our operational performance in the second half of 2015.*** We continue to work with our [Codeshare] [P]artners on these issues.

88.     The foregoing statement in ¶ 87, upon which Plaintiffs detrimentally relied when purchasing their shares, was materially false and/or rendered misleading by the omission of material facts.   The Delta Connection Agreements required Republic to maintain adequate staffing levels at all times.  As alleged above in ¶¶56-59, Defendant Bedford knew or recklessly disregarded that Delta initially had objected to Republic's requests in January and April 2015 to reduce its scheduled flying hours due to inadequate pilot staffing under the Delta Connection Agreements as a violation of that agreement.

**B.     MAY 8, 2015 EARNINGS CALL**

89.     During the Company's May 8, 2015 Earnings Call, Defendant Bedford represented in pertinent part:   "[W]e have asked our partners to reduce our levels of flying this summer.  ***Thankfully, we're getting their support***.  ***We're grateful to our partners for their collaboration***, ***working with us*** during this challenging period."

90.     The foregoing statement in ¶ 89, upon which Plaintiffs detrimentally relied when purchasing their shares, was materially false and/or rendered misleading by the omission of material facts.   The Delta Connection Agreements required Republic to maintain adequate staffing levels at all times.  As alleged above in ¶¶ 56-59, Defendant Bedford knew or recklessly disregarded that Delta initially had objected to Republic's requests in January and April 2015 to reduce its scheduled flying hours due to inadequate pilot staffing under the Delta Connection Agreements as a violation of that agreement.

**C.     2Q15 FORM 10-Q**

91.     The Company's 2Q15 Form 10-Q publicly filed with the SEC on August 7, 2015, which was signed by Defendant Bedford, stated in pertinent part:

> As a result of pilot supply constraints caused by industry regulatory changes, our ongoing labor dispute and other factors, the Company's operational performance in 2015 has deteriorated.

> *The Company has initiated discussions with its [Codeshare]*
> *[P]artners to further reduce flying schedules during the second*
> *half of 2015 and early 2016.*

92.     The foregoing statement in ¶ 91, upon which Plaintiffs detrimentally relied when purchasing their shares, was materially false and/or rendered misleading by the omission of material facts.   The Delta Connection Agreements required Republic to maintain adequate staffing levels at all times.  As alleged above in ¶¶ 56-59, Defendant Bedford knew or recklessly disregarded that Delta initially had objected to Republic's requests in January and April 2015 to reduce its scheduled flying hours under the Delta Connection Agreements.

**D.     AUGUST 7, 2015 EARNINGS CALL**

93.     During Republic's August 7, 2015 Earnings Call, in response to concerns from analysts' regarding Republic's ability to satisfy its obligations under the codeshare agreements, Defendant Bedford stated in relevant part:

> **Mike Linenberg** - Deutsche Bank – Analyst
> Okay.  Very good.  My second question is just having seen your contracts in the past, I assume based on your performance of late that you would be in breach of those contracts and knowing that there is a period to cure that potential breach and of course, working with [Seabury] and all your partners you're currently trying to address that, but have many of your major carriers or major partners held back any cash that – you're owed at the end of the period?

> **Bryan Bedford** - Republic Airways - Chairman, President, CEO
> Well, let's clear up the – the potential misconception, Mike.  *We are not in breach on any of our agreements.  We're not in default under any of the operational [sic], given the fact that we believe able to reach consensual understandings with the partners on some operational reductions over the course of the summer.*

94.     Also during the August 7, 2015 Conference Call, Defendant Allman represented as follows:

> **Mike Linenberg** - Deutsche Bank - Analyst

Okay. And then has any partner held back – sometimes I know they can be slow in paying or are you sort of everything is up – everything is copacetic as it relates to receiving payments from your major carrier partners.

**Joe Allman** - Republic Airways - CFO
Good question, Mike.  This is Joe.  ***No.  Everybody has been performing under the contract.***

95.     Each of the foregoing statements in ¶¶ 93-94 during the August 7 Conference Call, upon which Plaintiffs detrimentally relied when purchasing their shares, was materially false and/or rendered misleading by the omission of material facts because, as alleged above in ¶¶ 56-59, Defendants knew or recklessly disregarded that Delta rejected Republic's requests in January and April of 2015 to reduce its scheduled flying hours under the Delta Connection Agreements.  Further, as alleged above in ¶¶ 75, 85, Defendants knew or recklessly disregarded that United and American also would have claims for breach of contract based upon their discussion of such claims "as early as . . . August 2015" arising from the Codeshare Partners' "***major*** concessions" under the codeshare agreements.

**E.     OCTOBER 7, 2015 PRESS RELEASE**

96.     The Company's October 7, 2015 Press Release stated with respect to the Delta Action:

Republic Airways Holdings Inc. (NASDAQ/NM: RJET) has been made aware of a complaint filed by Delta. The Company has not been served and has not received the full complaint and therefore cannot comment further on the matter at this time.  ***Republic can confirm that the Company is not in breach of any of its capacity purchase agreements with any of its mainline partners, including both Delta Connection Agreements.***

97.     The foregoing statement in ¶ 96 confirming that Republic was not in breach of its Delta Connection Agreements, upon which Plaintiffs detrimentally relied when purchasing their shares, was materially false and/or rendered misleading by the omission of material facts

because, as alleged above in ¶¶ 56-59, Defendants knew or recklessly disregarded that Delta rejected Republic's requests in January and April of 2015 to reduce its scheduled flying hours under the Delta Connection Agreements.  In addition, as alleged above in ¶¶ 60, 62, Defendants knew or recklessly disregarded that Republic had:  (i) unilaterally demanded that Delta ground a portion of its ERJ-170/175 fleet to accommodate Republic's inability to staff those aircraft just prior to Delta initiating the Delta Action; and (ii) informed Delta in August 2015 that it would not place at least two of nine additional ERJ-170 aircraft into service, as required under an amendment to the ERJ-170/175 Agreement.  Further, as alleged above in ¶¶ 75, 85, 86, Defendants knew or recklessly disregarded that United and American also would have claims for breach of contract based upon:  (i) their discussion of such claims "as early as . . . August 2015" arising from the Codeshare Partners' "*major* concessions" under the codeshare agreements; and (ii) Republic's negotiations with United "to comprehensively restructure the parties' relationship" that began in September 2015.

###    F.    NOVEMBER 4, 2015 PRESS RELEASE

98.    The Company's November 4, 2015 Press Release, which was attached as an exhibit to Republic's current report on Form 8-K filed with the SEC on November 5, 2015 and signed by Defendant Allman, stated in pertinent part with respect to the Delta Action:

> On Oct. 5, 2015, Delta Air Lines Inc. ("Delta") filed suit against the Company alleging that the Company was in breach of its contractual obligations under both Delta Connection Agreements. Delta alleges among other things, that Shuttle America breached the Agreements by failing to operate all of Delta's flights, and claims damages.  ***We believe the allegations are <u>unfounded</u> and <u>without merit</u>.***

99.    The foregoing statement in ¶ 98 disputing the allegations in the Delta Action as "unfounded and without merit," upon which Plaintiffs detrimentally relied when purchasing their shares, was materially false and/or rendered misleading by the omission of material facts. *First*,

as alleged above in ¶¶ 56-59, Defendants knew or recklessly disregarded that Delta rejected Republic's requests in January and April of 2015 to reduce its scheduled flying hours under the Delta Connection Agreements.  In addition, as alleged above in ¶¶ 60, 62, Defendants knew or recklessly disregarded that Republic had:  (i) unilaterally demanded that Delta ground a portion of its ERJ-170/175 fleet to accommodate Republic's inability to staff those aircraft just prior to Delta initiating the Delta Action; and (ii) informed Delta in August 2015 that it would not place at least two of nine additional ERJ-170 aircraft into service, as required under an amendment to the ERJ-170/175 Agreement.  *Second*, and more specifically, as alleged above in ¶ 73, as a result of the "extensive negotiations between Republic and Delta that began over four months" before the Company filed for bankruptcy on February 25, 2016 (and notably, also before Republic issued November 4, 2015 Press Release), Defendants knew or recklessly disregarded that Republic's potential liability in the Delta Action was significant (potentially more than $1.7 billion) and included damages for future lost profits caused by its breach of the ERJ-145 Agreement extended through May 2021.  Defendants had a duty to disclose these omitted material facts for the reasons set forth below in ¶¶ 106-11.

### G.    3Q15 FORM 10-Q

100.    The Company's 3Q15 Form 10-Q publicly filed with the SEC on November 4, 2015, which was signed by Defendants Bedford and Allman, included the following disclosure regarding the Delta Action:

> On October 5, 2015, Delta Air Lines, Inc. (Delta) filed suit against the Company alleging that the Company was in breach of its contractual obligations under both Delta Connection Agreements. Delta alleges, among other things, that Shuttle America breached the Agreements by failing to operate all of Delta's flights, and claims damages. ***We believe the allegations are unfounded and without merit and intend to pursue our rights, remedies and defenses in the litigation.*** Delta has withheld in excess of $10.0 million of contractual payments through September 30, 2015,

33

which has resulted in past due receivables on the Company's balance sheet. ***The Company disputes Delta's right to withhold payments and intends to seek their recovery.*** The Company has deferred recognition of this revenue until this dispute can be resolved.

101.    The foregoing statement in ¶ 100 disputing the allegations in the Delta Action as "unfounded and without merit," upon which Plaintiffs detrimentally relied when purchasing their shares, was materially false and/or rendered misleading by the omission of material facts. *First*, as alleged above in ¶¶ 56-59, Defendants knew or recklessly disregarded that Delta rejected Republic's requests in January and April of 2015 to reduce its scheduled flying hours due to inadequate pilot staffing under the Delta Connection Agreements as contrary to those agreements, which required Republic to maintain adequate staffing levels at all times.   In addition, as alleged above in ¶¶ 60, 62, Defendants knew or recklessly disregarded that Republic had:  (i) unilaterally demanded that Delta ground a portion of its ERJ-170/175 fleet to accommodate its inability to staff those aircraft just prior to Delta initiating the Delta Action; and (ii) informed Delta in August 2015 that it would not place at least two of nine additional ERJ-170 aircraft into service, as required under an amendment to the ERJ-170/175 Agreement. *Second*, and more specifically, as alleged above in ¶ 73, as a result of the "extensive negotiations between Republic and Delta that began over four months" before the Company filed for bankruptcy on February 25, 2016, Defendants knew or recklessly disregarded that Republic's potential liability in the Delta Action was significant and included damages for future lost profits caused by its breach of the ERJ-145 Agreement extended through May 2021.  Defendants had a duty to disclose these omitted material facts for the reasons set forth below in ¶¶ 106-11.

102.    In addition, the 3Q15 Form 10-Q stated as follows with respect to Delta's extension of the ERJ-145 Agreement:

On February 26, 2015, Delta Air Lines purported to exercise a right to extend aircraft under the E145 codeshare agreement from May 2016 to May 2021. ***The Company disputes the validity of the purported extension, which is contrary to the parties' previous communications and understanding.*** As the agreement does not contain any terms for an extension period, any such purported extension would be subject to mutual agreement on rates, terms, and conditions. ***No such mutual agreement has been reached and the Company believes that Delta has not made any good-faith efforts to engage in such discussions. Absent such an agreement it would expire by its terms on May 31, 2016.***

103.   The foregoing statement in ¶ 102 disputing the validity of Delta's extension of the ERJ-145 Agreement, upon which Plaintiffs detrimentally relied when purchasing their shares, was materially false and/or rendered misleading by the omission of material facts. As alleged above in ¶ 73, as a result of the "extensive negotiations between Republic and Delta that began over four months" before the Company filed for bankruptcy on February 25, 2016, Defendants knew or recklessly disregarded that Republic's potential liability in the Delta Action was significant and included damages for future lost profits caused by its breach of the ERJ-145 Agreement extended through May 2021. Indeed, that period of "over four months" would have overlapped with Defendants' representations in the November 4, 2015 Press Release and the 3Q15 Form 10-Q filed on November 5, 2015.

### H.   THE BEDFORD DECLARATION

104.   In the Bedford Declaration filed on February 25, 2016 in the Bankruptcy Case, Defendant Bedford stated in pertinent part: "Although ***there was no merit to Delta's lawsuit***, unfortunately, the existence of the litigation and the uncertainty of its resolution became an impediment to reaching resolutions with the other Codeshare Partners."

105.   The foregoing statement in ¶ 104 asserting that "there was no merit" to the Delta Action, upon which Plaintiff Axar detrimentally relied when purchasing its shares, was materially false and/or rendered misleading by the omission of material facts. *First*, as alleged

35

above in ¶¶ 56-59, Defendants knew or recklessly disregarded that Delta rejected Republic's requests in January and April of 2015 to reduce its scheduled flying hours under the Delta Connection Agreements due to inadequate pilot staffing as contrary to those agreements, which required Republic to maintain adequate staffing levels at all times.  In addition, as alleged above in ¶¶ 60, 62, Defendants knew or recklessly disregarded that Republic had:  (i) unilaterally demanded that Delta ground a portion of its ERJ-170/175 fleet to accommodate its inability to staff those aircraft just prior to Delta initiating the Delta Action; and (ii) informed Delta in August 2015 that it would not place at least two of nine additional ERJ-170 aircraft into service, as required under an amendment to the ERJ-170/175 Agreement.  *Second*, and more specifically, as alleged above in ¶ 73, as a result of the "extensive negotiations between Republic and Delta that began over four months" before the Company filed for bankruptcy on February 25, 2016, Defendants knew or recklessly disregarded that Republic's potential liability in the Delta Action was significant and included damages for future lost profits caused by its breach of the ERJ-145 Agreement extended through May 2021.  Indeed, Republic submitted sworn testimony in the Bankruptcy Case stating that Delta had asserted a $1.7 billion claim against the Company, and Republic knew by no later than January 2016 that its potential liability in the Delta Action was in the ***hundreds of millions of dollars***.  Defendants had a duty to disclose these omitted material facts for the reasons set forth below in ¶¶ 106-11.

## VI.   DEFENDANTS HAD A DUTY TO DISCLOSE REPUBLIC'S POTENTIAL LIABILITY IN THE DELTA ACTION

106.   Defendants had a duty to disclose Republic's potential liability in the Delta Action under General Accepted Accounting Principles ("GAAP").  Specifically, under Accounting Standards Codification Topic 450 ("ASC 450"), which governs the disclosure and accrual of contingencies by public companies in their periodic reports filed with the SEC, if the

likelihood of a material loss is "reasonably possible," i.e., more likely than remote, but less likely than probable, and the amount of the reasonably possible loss is estimable, then a company must disclose the nature of the contingency and also provide its estimate of the amount or range of loss.  Otherwise, if the reasonably possible loss is not estimable, then a company must disclose the nature of the contingency and describe why it is unable to estimate the amount of the loss.

107.    ASC 450-20-55 provides examples of loss contingencies covered by ASC 450 and, as pertinent here, specifically includes "litigation, claims, and assessments."  At minimum, ASC 450-20-55-13 provides that a loss contingency involving a filed claim ***must be disclosed if there is a reasonable possibility that the outcome will be unfavorable.***  Thus, in cases where the filed claim has not yet been resolved, but an unfavorable outcome is reasonably possible, ASC 450 requires a public company to disclose in its periodic report the nature of the contingency and any amount of loss that is reasonably possible.  ASC-450-20-55-31.

108.    Because Republic admitted that it had been engaged in extensive negotiations with Delta for over four months prior to filing for bankruptcy on February 25, 2016, Defendants should have been aware as of November 5, 2015 when the Company filed its 3Q15 Form 10-Q that an unfavorable outcome of the Delta Action was "reasonably possible," therefore requiring Defendants to disclose in the 3Q15 Form 10-Q the estimated loss that Republic would incur in settling Delta's claims, or, at a minimum, the nature of this contingency and why it could not be estimated.

109.    Defendants further had a duty to disclose Republic's potential liability in the Delta Action under Item 303 of Regulation S-K, 17 C.F.R. § 229.303 ("Item 303"), which requires that every Form 10-Q and Form 10-K filing with the SEC contain "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"), in

which the issuer must "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). This duty is imposed "where a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations."

110.    Here, Item 303 required Defendants to disclose in the MD&A section of Republic's 3Q15 Form 10-Q that the Company was exposed to the risk that **the Delta Action was reasonably likely to result in significant liability** because Republic's admission that it had been engaged in extensive negotiations with Delta over the settlement agreement for more than four months prior to filing for bankruptcy on February 25, 2016 rendered the Company's potential liability in the Delta Action a known uncertainty that Defendants reasonably expected would have a material unfavorable impact on the Company's financial condition.

111.    Under Item 303, Defendants further had a duty to disclose in the MD&A Section of the 3Q15 Form 10-Q that the Company was exposed to claims asserted by United and Delta for breach of its codeshare agreements that were reasonably likely to have a material adverse impact on the Company's financial condition and operations because Defendant Allman admitted that as early as August 2015, he had informed Republic's Board that the Codeshare Partners had claims arising from the "***major*** concessions" they had made to Republic with respect to their codeshare agreements.

## VII.    SCIENTER

112.    As alleged above, Defendants Allman and Bedford acted with scienter in that they: (i) knew or recklessly disregarded that the statements identified above in ¶¶ 87-105 were materially false and/or misleading when made; (ii) knew or recklessly disregarded that such

statements would be issued or disseminated to the investing public; (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents; and/or (iv) knowingly or recklessly engaged in the fraudulent scheme alleged herein as primary violators of the federal securities laws.  Defendants Allman and Bedford, by virtue of their receipt of information reflecting the true facts regarding Republic's liability for breaches of its codeshare agreements with Delta and United, and their control over, and receipt or modification of the materially false and/or misleading statements made or disseminated to the investing public, actively participated in the fraudulent scheme alleged herein.

113.    *First*, as alleged above in ¶¶ 56-59, 60, 62, Defendants Allman and Bedford knew or recklessly disregarded that Republic was in breach of its codeshare agreements because:  (i) in January and April 2015, Delta rejected Republic's requests to reduce its scheduled flying due to inadequate pilot staffing as contrary to those agreements, which required the Company to maintain adequate staffing levels at all times; and (ii) in August 2015, the Company informed Delta that it would not place into service at least two of nine additional ERJ-170 aircraft, as required by an amendment to the ERJ-170/175 Agreement.

114.    *Second*, as alleged above in ¶¶ 73-74, Defendants Allman and Bedford also knew or recklessly disregarded that Republic faced significant potential liability on Delta's claims in the Delta Action, including damages for future lost profits caused by Republic's breach of the ERJ-145 Agreement through May 2021 because:  (i) Republic admitted that its settlement negotiations with Delta began more than four months prior to the Company filing for bankruptcy on February 25, 2016; and (ii) Delta disclosed that the majority of its estimated $1.7 billion in damages reflected damages attributable to Republic's breach of the ERJ-145 Agreement.

115.   *Third*, as alleged above in ¶¶ 75, 85, 86, Defendants knew or recklessly disregarded that that United and American would also assert claims for damages against Republic for breach of contract due to the Company's inadequate pilot staffing and reductions in flights for each of these Codeshare Partners based upon: (i) Defendant Allman's discussion with Republic's Board "as early as . . . August 2015" of such claims arising from the Codeshare Partners' "*major* concessions" under the codeshare agreements; and (ii) through Republic's negotiations with United "to comprehensively restructure the parties' relationship" that began in September 2015,

116.   *Fourth*, as alleged above in ¶¶106-11, Defendants Allman and Bedford were required to disclose Republic's potential liability in the Delta Action under ASC 450 and Item 303.  Defendants Allman and Bedford's violations of the affirmative disclosure duties imposed by GAAP and Item 303 further support an inference of scienter.

117.   *Fifth*, Defendants Allman and Bedford, as Republic's executive officers, controlled the contents of the Company's public SEC filings during the Class Period.  Each was provided with, or had access to, copies of the documents alleged herein to be materially false and/or misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance.  By virtue of their respective positions and access to material non-public information regarding the Company, each knew or recklessly disregarded that the adverse facts alleged herein concerning Republic's potential liability in the Delta Action had not been disclosed to, and were being concealed from the public, and that the positive representations that were being made were materially false, misleading, and/or incomplete.  As a result, Defendants Allman and Bedford were responsible for the accuracy of Republic's public SEC filings, and

were therefore responsible and liable for the representations contained therein or omitted therefrom.

118.   **Sixth**, Defendants Allman and Bedford separately executed certifications pursuant to Section 302 of the Sarbanes-Oxley Act ("SOX") attesting to the Company's disclosure controls and procedures in pertinent part as follows:

> The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and we have:
>
> a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision to ensure that **material information** relating to the registrant, including its consolidated subsidiaries, **is made known to us** by others within those entities, particularly during the period in which this report is being prepared.

119.   **Seventh**, the fact that Republic's performance under its codeshare agreements involved the Company's core business operations further supports an inference of scienter. Indeed, given Defendants Allman and Bedford's intimate involvement in the management and oversight of the Company, as well Defendant Allman's direct role in Republic's settlement negotiations with Delta, it is simply inconceivable that they were not aware of Republic's nonperformance under the Delta Connection Agreements and the Company's potential liability in the Delta Action.

## VIII.   PROXIMATE CAUSE

120.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs.  As a direct result of Defendants' materially false and/or misleading statements, Plaintiffs purchased their shares of Republic common stock.

121.   Defendants' material misstatements and omissions concealed the foreseeable risk that Republic's purported equity value of $590 million as of January 31, 2016 would be

substantially offset by at least $975 million to potentially over $1 billion dollars in claims in the Bankruptcy Case. Indeed, approximately 62% of these claims in the Bankruptcy Case are related to Republic's breaches of its codeshare agreements despite Defendants': (i) misrepresentations that Republic was not in breach of its codeshare agreements; and (ii) failure to disclose such potential liability owed to its Codeshare Partners.

122. On March 24, 2016, that foreseeable risk began to materialize when Republic announced that it had agreed to settle Delta's claims in the Delta Action by granting to Delta an unsecured claim in the amount of $170 million in the Bankruptcy Case, which set the precedent for the Company's settlement of claims with the other Codeshare Partners.

123. Subsequently, on May 27, 2016, the Company reached a similar settlement agreement with United that granted United a $193 million general unsecured claim in the Bankruptcy Case.

124. Thereafter, on September 2, 2016, Republic entered into the Claim Settlement with American that granted American a $250 million general unsecured claim in the Bankruptcy Case. Accordingly, there are now $613 million of previously undisclosed liabilities that will dilute equity recovery on a dollar-for-dollar basis. That sum is material, representing approximately $12.00 per share of equity value.

125. Republic's settlement agreements with the Codeshare Partners have significantly diluted the value of Plaintiffs' existing investments in Republic. Accordingly, Plaintiffs have suffered substantial losses as a direct and proximate result of their reliance on Defendants' material misstatements and omissions.

IX.    **NO SAFE HARBOR**

126.    The statutory safe harbor and/or the bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the materially false and/or misleading statements alleged herein.

127.    None of the statements alleged herein was a forward-looking statement, nor were they identified as "forward-looking statements" when made.   Rather, each was a historical statement or a statement of purportedly current facts and conditions at the time each statement was made.

128.    To the extent that any materially false and/or misleading statement alleged herein, or any portion thereof, can be construed as forward-looking, such statement was not accompanied by meaningful cautionary language identifying important factors that could cause actual results to differ materially from those set forth in the purportedly forward-looking statement.

129.    Alternatively, to the extent the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Republic who knew that those statements were false when made.

X.    **CONTROL PERSON ALLEGATIONS/GROUP PLEADING**

130.    By virtue of Defendants' positions within the Company, they had access to undisclosed adverse information about Republic, its business, operations, operational trends, finances, and present and future business prospects.   Defendants would ascertain such information through Republic's internal corporate documents, conversations, and connections

with other corporate officers, bankers, traders, risk officers, marketing experts, employees, attendance at management and Board meetings, including committees thereof, and through reports and other information provided to them in connection with their roles and duties as Republic officers and/or directors.

131.    It is appropriate to treat Defendants collectively as a group for pleading purposes and to presume that the materially false, misleading, and incomplete information conveyed in the Company's public filings, press releases, and public statements, as alleged herein, was the result of the collective actions of Defendants.  Defendants, by virtue of their high-level positions within the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company, its business, operations, prospects, growth, finances, and financial condition, as alleged herein.

132.    Defendants were involved in drafting, producing, reviewing, approving, and/or disseminating the materially false and misleading statements and information alleged herein, were aware of or recklessly disregarded the fact that materially false and misleading statements were being issued regarding the Company and themselves, and approved or ratified these statements, in violation of the federal securities laws.

133.    As officers and controlling persons of a publicly held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, traded on the NASDAQ, and governed by the provisions of the federal securities laws, Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, risk, earnings, and present and future business prospects, and to correct any

previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information. Defendants' material misrepresentations and omissions violated these specific requirements and obligations.

134.    Defendants, by virtue of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company.   Defendants were provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.   Accordingly, Defendants are responsible for the accuracy of the public reports and releases detailed herein.

135.    Each Defendant is liable as a participant in a scheme, plan, and course of conduct that operated as a fraud and deceit on Plaintiffs.

## XI.    CAUSES OF ACTION

### COUNT I

### Violation of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Defendants Bedford and Allman

136.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

137.    This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC against Defendants Bedford and Allman.

138.    As alleged herein, Defendants Bedford and Allman, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made untrue statements of material

fact and/or omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Defendants Bedford and Allman intended to and did, as alleged herein, (i) deceive the investing public, including Plaintiffs; and (ii) cause Plaintiffs to purchase Republic common stock.

139.   Defendants Bedford and Allman were individually and collectively responsible for making the false and misleading statements and omissions alleged herein and having engaged in a plan, scheme and course of conduct designed to deceive Plaintiffs, by virtue of having made public statements and prepared, approved, signed and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

140.   As set forth above, Defendants Bedford and Allman made their false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Plaintiffs who purchased Republic common stock.

141.   In ignorance of the false and misleading nature of Defendants Bedford's and Allman's statements and omissions, and relying directly on those statements, Plaintiffs purchased Republic common stock.  But for the fraud, Plaintiffs would not have purchased Republic common stock.  As set forth herein, when the true facts were subsequently disclosed, the foreseeable risk of substantial dilution to Plaintiffs' investments in the Company materialized, and Plaintiffs were harmed and damaged as a direct and proximate result of their purchases of Republic common stock in reliance on Defendants Bedford's and Allman's material misstatements and omissions.

142.    By virtue of the foregoing, Defendants Bedford and Allman are liable to Plaintiffs for violations of Section 10(b) of the Exchange Act and Rule 10b-5.

## COUNT II

### Violation of § 20(a) of the Exchange Act Against All Defendants

143.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

144.    This Count is asserted pursuant to Section 20(a) of the Exchange Act against all Defendants.

145.    As alleged above, Defendants Allman and Bedford caused Republic to violate Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by making material misstatements and omissions in connection with the purchase and sale of Republic common stock and by participating in a fraudulent scheme and course of business or conduct.  This fraudulent conduct was undertaken with scienter, and the Company is charged with the knowledge and scienter of each of Defendants Allman and Bedford who knew of or recklessly disregarded the falsity of the Company's statements and the fraudulent nature of its scheme.

146.    As set forth above, all Defendants were controlling persons of Republic at all relevant times, due to their positions as senior executive officers or directors of the Company and their direct involvement in the Company's day-to-day operations, including their power to control or influence the transactions giving rise to the securities violations alleged herein, and exercised the same.

147.    By virtue of the foregoing, all Defendants each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Republic, including the content of public statements with respect to Republic's financial condition and operations.

47

148.     As set forth above in ¶¶ 112-19, Defendants Allman and Bedford acted knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful fraud and deceit upon Plaintiffs who purchased Republic common stock.

149.     As set forth above in ¶¶ 130-35, with respect to the statements alleged in ¶¶ 87-88, 91-92, 96-103, the Director Defendants acted knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful fraud and deceit upon Plaintiffs who purchased Republic common stock.

150.     In ignorance of the false and/or misleading nature of Defendants' statements and omissions, and relying directly on those statements, Plaintiffs purchased Republic common stock.  But for the fraud, Plaintiffs would not have purchased Republic common stock.  As set forth herein, when the true facts were subsequently disclosed, the foreseeable risk of substantial dilution to Plaintiffs' investments in the Company materialized, and Plaintiffs were harmed and damaged as a direct and proximate result of their purchases of Republic common stock in reliance on Defendants' material misstatements and omissions.

151.     By reason of the foregoing, all Defendants are liable to Plaintiffs as controlling persons of Republic in violation of Section 20(a) of the Exchange Act.

## COUNT III

### Common Law Fraud Against Defendants Bedford and Allman

152.     Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

153.     Defendants Belford and Allman made, authorized, or caused the misrepresentations and/or omissions set forth above.

154.     Those misrepresentations and omissions were material.

48

155.   The material misrepresentations set forth above were knowingly made by such Defendants with the intent to deceive, and such Defendants' representations omitted and concealed material facts from Plaintiffs.

156.   Each such Defendant knew its representations were false and/or misleading, and their omissions were material and rendered their representations misleading, at the time they were made or omitted.

157.   Defendants knew that Plaintiffs would receive and rely on such representations, and intended that their false and/or misleading statements would induce Plaintiffs to purchase Republic common stock.

158.   Plaintiffs reasonably and justifiably relied on such misrepresentations and omissions.  Plaintiffs would not have purchased Republic common stock at all had they known the true facts regarding Republic's potential liability in the Delta Action.

159.   As a direct and proximate result of such reliance, and these Defendants' fraudulent misconduct, Plaintiffs have suffered damages.

## XII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request relief and judgment, including:

A.   Awarding compensatory damages in favor of Plaintiffs against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including pre-judgment and post-judgment interest, as allowed by law;

B.   Awarding Plaintiffs their costs and expenses incurred in this action, including reasonable counsel fees and expert fees; and

C.   Awarding such other and further relief as may be just and proper.

49

## XIII.  JURY DEMAND

Plaintiffs hereby demand a trial by jury on all triable claims.

Dated: January 20, 2017

/s/  Sharan Nirmul

**KESSLER TOPAZ
MELTZER & CHECK, LLP**
Sharan Nirmul
Geoffrey C. Jarvis
Meredith L. Lambert
280 King of Prussia Road
Radnor, PA  19087
Tel:  (610) 667-7706
Fax:  (610) 667-7056
Email: snirmul@ktmc.com
Email: gjarvis@ktmc.com
Email: mlambert@ktmc.com

*Counsel for Plaintiffs Axar Master Fund, Ltd. and
Man GLG Select Opportunities Master LP*