UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
AXAR MASTER FUND, LTD. and MAN GLG
SELECT OPPORTUNITIES MASTER LP,

                              Plaintiffs,

              -against-                                                        17-cv-0426 (LAK)

BRYAN K. BEDFORD, et al.,

                              Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**MEMORANDUM OPINION**


              Appearances:

                       Geoffrey Coyle Jarvis
                       Nathan Hasiuk
                       Sharan Nirmul
                       KESSLER TOPAZ MELTZER & CHECK, LLP

                       *Attorneys for Plaintiffs*

                       Jay B. Kasner
                       Scott D. Musoff
                       Tansy Woan
                       SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

                       *Attorneys for Defendants*


LEWIS A. KAPLAN, *District Judge.*

              This is a securities fraud case against officers and directors of Republic Airways

Holdings Inc. ("Republic").  The matter is before the Court on defendants' motion to dismiss the

complaint pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) [DI 26].  Defendants'

motion is granted.

*Facts*

The following facts are alleged in the complaint and the documents referenced therein,[1] the truth of which the Court is bound to assume when considering a motion to dismiss.[2]

A.      The Parties

Plaintiffs Axar Master Fund, Ltd. ("Axar") and Man GLG Select Opportunities Master LP ("Man GLG") are investment funds and minority shareholders of Republic,[3] which is a regional airline that carries passengers for United Airlines, Inc. ("United"), Delta Air Lines, Inc. ("Delta"), and American Airlines Group, Inc. ("American").[4] It owns and operates a fleet of aircraft

---

[1]      DI 3 ("Complaint").  Docket item references are to the docket sheet in 17-cv-426 (LAK) unless otherwise indicated.

[2]      *Rombach v. Chang*, 355 F.3d 164, 169 (2d Cir. 2004) (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000)).

"In deciding a motion to dismiss, a court considers the complaint, 'any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit.'" *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 129 F. Supp. 3d 48, 64 (S.D.N.Y. 2015) (quoting *ATSI Commc'ns Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)).

[3]      Between August 8, 2015 and February 26, 2016, Axar purchased more than 10 million shares of Republic.  Between July 27, 2015 and February 24, 2016, Man GLG purchased more than 3.1 million shares of Republic.  Complaint at ¶¶ 22-23.

[4]      *Id.* at ¶ 1.

and provides scheduled regional passenger services through fixed fee code share agreements with United, Delta, and American (together, the "Codeshare Partners").[5] These code share agreements and business relationships with Codeshare Partners generate substantially all of Republic's operating revenue.[6]

During the relevant time period, defendant Bryan K. Bedford was the chairman of Republic's board of directors (the "Board") and Republic's president and chief operating officer. Joseph P. Allman was Republic's senior vice president and chief financial officer. Neal S. Cohen was the lead independent director of the Board. Robert L. Colin served as a director on the Board and chairman of the Board's audit committee. Daniel P. Garton and Mark L. Plaumann both served as directors and as members of the Board's audit committee.[7]

B.    *Republic's Pilot Staffing Issues and Contract Dispute with Delta*

In early 2015, Republic began experiencing a shortage of qualified pilots as a result

---

[5]    Republic provides these services through its wholly owned airline carrier subsidiaries, Shuttle America Corporation and Republic Airline Inc. and operates under the designations of United Express, Delta Connection, and American Eagle. *Id.* at ¶ 31. Generally under Republic's code share agreements, all of which are fixed-fee capacity purchase agreements, the relevant Codeshare Partner purchases Republic's seat capacity. The Codeshare Partner is then responsible for "provid[ing] ground support and gate access, incur[ring] operating expenses relating to fuel, navigation, airport use, and terminal handling, and determin[ing] pricing, scheduling, ticketing, and seat inventory." Republic, meanwhile, is responsible for "the costs of labor, aircraft maintenance, safety and compliance oversight, and aircraft financing." *Id.* at ¶ 33.

[6]    *In re Republic Airways Holdings Inc.*, No. 16-bk-10429 (SHL), 2016 WL 2616717, at *1 (Bankr. S.D.N.Y. May 4, 2016); *see also* Complaint at ¶ 32.

[7]    *Id.* at ¶¶ 24-29.

of new regulations concerning pilot qualifications and a dispute with its pilots' union, the

International Brotherhood of Teamsters ("Teamsters").[8]  The shortage was sufficiently dramatic that

Republic approached its Codeshare Partners in early 2015 to discuss reducing the scheduled amount

of flying hours under their respective code share agreements.[9]   At the same time, Republic

endeavored also to increase operational efficiency by phasing out smaller airplane types (specifically

the ERJ-145 aircraft) from its fleet.[10]

Delta early on rejected Republic's efforts to both reduce its flying hours and phase

out its smaller aircrafts.[11]   In January 2015, Republic proposed to Delta that, beginning in 2015,

Republic no longer operate a full schedule of flights under its ERJ-145 Agreement with Delta.  Delta

did not agree that the pilot shortage excused Republic's performance under the ERJ-145 Agreement

and rejected Republic's proposal.[12]   Then, in February 2015, Republic announced plans to wind

down its ERJ-145 operations after May 31, 2016, when its ERJ-145 Agreement with Delta was set

to expire.   Delta claimed a right to extend its agreement with Republic for another five years.[13]

Finally, in April 2015, Republic demanded another significant reduction in scheduled flying hours,

---

[8]
      *Id.* at ¶¶ 35-37.

[9]
      *Id.* at ¶ 44.

[10]
      *Id.* at ¶ 39.

[11]
      Republic had entered into two code share agreements with Delta: one concerning the use of the smaller ERJ-145 aircraft (the "ERJ-145 Agreement") and another concerning the use of the larger ERJ-170 and ERJ-175 aircrafts (the "ERJ-170/175 Agreement").  *Id.* at ¶ 55.

[12]
      *Id.* at ¶¶ 56-57.

[13]
      *Id.* at ¶ 41.

this time of its ERJ-170 and ERJ-175 aircrafts, for the months of June, July, and August 2015.  Delta

rejected this demand as well and claimed that Republic was in breach of the requirement under the

ERJ-170/175 Agreement to maintain adequate pilot staffing levels at all times.[14]

C.    *Initial Disclosures by Republic*

On May 8, 2015, Republic filed its first quarter Form 10-Q with the SEC.  The Form,

which was signed by Bedford, disclosed that:

> "As a result of pilot supply constraints exacerbated by industry regulatory changes,
> our ongoing labor dispute and other factors, the Company's operational performance
> in 2015 has deteriorated.  We have agreed with our [Codeshare] [P]artners to reduce
> schedules to improve our operational performance in the second half of 2015.  We
> continue to work with our [Codeshare] [P]artners on these issues."[15]

During an earnings call for the first quarter, which took place also on May 8, 2015,

Bedford affirmed this point, stating:

> "There's really no point in speculating as to whether or not our ongoing labor dispute
> is driving escalated levels of crew cancellations.  Regardless, we are convinced that
> the most expedient way to get back to our historically high levels of performance is
> to reach a successful outcome at the bargaining table.  Unfortunately, until this
> happens, we expect our operational reliability will remain challenged.  And in light
> of that reality, we have asked our partners to reduce our levels of flying this summer.
> Thankfully, we're getting their support.  We're grateful to our partners for their
> collaboration working with us during this challenging period."[16]

During the same call, Bedford acknowledged also Delta's purported extension of the

ERJ-145 Agreement.  He stated that Delta's response had been "unexpected," and that:

---

[14]

*Id.* at ¶¶ 58-59.

[15]

Republic Airways Holdings Inc., Quarterly Report (Form 10-Q) at 11 (May 8, 2015).

[16]

DI 28-12 at ECF 3.

"In terms of the single fleet . . . that's still subject to . . . working through a minor, I think, scope related issue with Delta as a partner. So we're working through that right now, and again, I think there's collaboration there. Delta certainly understands that there's value in our fleet and operational simplification in terms of meeting their longer term needs for cost-effective reliable service."[17]

D.    *Ongoing Pilot Shortages Lead to Delta Lawsuit*

The shortage of pilots worsened through the first half of 2015    so much so that Republic had to ask its Codeshare Partners for further reductions in flying hours.[18]   Republic knew as early as August 2015 that it would have to ask for major concessions from its Codeshare Partners and compensate them accordingly.[19]   Indeed, In Republic's second quarter Form 10-Q, filed on August 7, 2015, it stated:

"The Company has initiated discussions with its CPA partners to further reduce flying schedules during the second half of 2015 and early 2016. The reduced level of flying with our partners may result in adverse effects on our operating results."[20]

Accordingly, at some point in August 2015, Republic informed Delta that it would not place into service at least two out of the nine additional ERJ-170 aircraft required under an amendment to the ERJ-170/175 Agreement.[21]   Nonetheless, as of August 7, 2015, the company's leadership appeared optimistic.   During the second quarter earnings call on August 7, 2015, one

---

[17]    Complaint at ¶ 42 (emphasis omitted).

[18]    *Id.* at ¶¶ 48-49.

[19]    *Id.* at ¶ 75.

[20]    Republic Airways Holdings Inc., Quarterly Report (Form 10-Q) at 12 (Aug. 7, 2015).

[21]    Complaint at ¶ 62.

analyst, assuming that Republic was in breach of its code share agreements "based on [its] performance as of late," asked whether any of Republic's major carriers had withheld any cash. Bedford responded that:

> "We are not in breach on any of our agreements. We're not in default under any of the operational [sic], given the fact that we believe [sic] able to reach consensual understandings with the partners on some operational reductions over the course of the summer."

During the same call, Allman reiterated the point. Referring to Republic's Codeshare Partners, he stated, "Everybody has been performing under the contract."[22]

The company announced in September 2015 that it at last had reached a tentative agreement with the Teamsters.[23] By that time, however, Republic had begun negotiations with United to "comprehensively restructure the parties' relationship."[24] And, on October 5, 2015, Delta filed an action for breach of contract against Republic, alleging over $1 million in damages as a result of Republic's past and future staffing shortages because Delta had been forced to cancel flights and prevented from scheduling flights that it would have otherwise scheduled.[25]

---

[22]

*Id.* at ¶ 49 (emphasis omitted).

[23]

*Id.* at ¶¶ 51-53.

[24]

*Id.* at ¶ 86.

[25]

*Id.* at ¶ 64.

E.     *Republic's Disclosures in Response to the Delta Action*

Republic initially responded to Delta's lawsuit in a press release issued on October 7, 2015.  It stated that Republic had been made aware of the complaint filed by Delta and that:

> "The Company has not been served and has not received the full complaint and therefore cannot comment further on the matter at this time.  Republic can confirm that the Company is not in breach of any of its capacity purchase agreements with any of its mainline partners, including both Delta Connection Agreements."[26]

Republic subsequently made several statements asserting its belief that Delta's lawsuit was without merit.

In a subsequent a press release issued on November 4, 2015, Republic stated, "We believe the allegations are unfounded and without merit."[27]  The following day, Republic filed its Form 10-Q for the third quarter of 2015, in which it disclosed that:

> "On October 5, 2015, Delta . . . filed suit against the Company alleging that the Company was in breach of its contractual obligations under both Delta Connection Agreements. Delta alleges, among other things, that Shuttle America breached the Agreements by failing to operate all of Delta's flights, and claims damages. We believe the allegations are *unfounded and without merit* and intend to pursue our rights, remedies and defenses in the litigation. Delta has withheld in excess of $10.0 million of contractual payments through September 30, 2015, which has resulted in past due receivables on the Company's balance sheet. The Company disputes Delta's right to withhold payments and intends to seek their recovery. The Company has deferred recognition of this revenue until this dispute can be resolved."[28]

---

[26]

*Id.* at ¶ 65 (emphasis omitted).

[27]

*Id.* at ¶ 67 (emphasis omitted).

[28]

Republic Airways Holdings Inc., Quarterly Report (Form 10-Q) at 13 (Nov. 5, 2015) (emphasis added).

In the same Form 10-Q, Republic disclosed also that:

> "Primarily as a result of pilot supply constraints caused by industry regulatory

Republic addressed also Delta's purported extension of the ERJ-145 Agreement. It stated that:

> "On February 26, 2015, Delta Air Lines purported to exercise a right to extend aircraft under the E145 code-share agreement from May 2016 to May 2021. The Company disputes the validity of the purported extension, which is contrary to the parties' previous communications and understanding. As the agreement does not contain any terms for an extension period, any such purported extension would be subject to mutual agreement on rates, terms, and conditions. No such mutual agreement has been reached and the Company believes that Delta has not made any good-faith efforts to engage in such discussions. Absent such an agreement it would expire by its terms on May 31, 2016."[29]

F.      *The Bankruptcy Case*

Republic filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on February 25, 2016.[30] Bedford conveyed, both in a press release announcing the filing[31] and in a declaration filed with the bankruptcy court on the same day,[32] that the lawsuit with Delta was among the reasons that Republic had filed the petition. Bedford stated in the declaration that, "[a]lthough there was no merit to Delta's lawsuit, unfortunately, the existence of the litigation and the uncertainty

---

changes and the pilot labor dispute between the Company and Local 357, the Company's ability to meet its operational and financial targets in 2015 has been adversely affected. In order to address the effects of its pilot shortage, the Company is working with its CPA partners to reduce levels of flying during the second half of 2015 and beyond. In connection with this effort the Company is seeking to restructure its operational and contractual commitments. There can be no assurance that these efforts to reach consensual agreements with its stakeholders will be successful or that such agreements will fully restore the Companies operational and financial performance." *Id.* at 14.

[29]      *Id.* at 15.

[30]      Complaint at ¶ 71.

[31]      *Id.*

[32]      *Id.* at ¶ 72.

of its resolution became an impediment to reaching resolutions with the other Codeshare Partners."[33]

On March 24, 2016, Republic filed a motion in bankruptcy court for authorization to restructure its relationship with Delta and grant Delta an unsecured claim for $170 million "as part of a global resolution between Delta and Republic that include[d] both a settlement of the Delta Litigation . . . and the new agreements that [would] provide Republic with substantially enhanced economics."[34]  Republic said in its motion that "[t]he proposed settlement [was] the product of extensive negotiations between Republic and Delta that began over four months ago."[35]  The settlement was approved by the bankruptcy court[36] and then the district court over Axar's and Man GLG's objections.[37]

Republic moved for approval of similar settlements with United on May 27, 2016 and American on September 2, 2016, which granted unsecured claims of $193 million[38] and $250

---

[33]

> *Id.*

[34]

> No. 16-bk-10429 (SHL), DI 244 at 6-7.

[35]

> *Id.* at 24.

[36]

> *See In re Republic Airways Holdings Inc.*, No. 16-bk-10429 (SHL), 2016 WL 2616717 (Bankr. S.D.N.Y. May 4, 2016).

[37]

> *See In re Republic Airways Holdings Inc.*, No. 16-cv-3315 (KBF), 2016 WL 2621990 (S.D.N.Y. May 6, 2016).

[38]

> No. 16-bk-10429 (SHL), DI 614.

million,[39] respectively.  Both settlements subsequently were approved.[40]  They were reached in order to reimburse the Codeshare Partners for Republic's breaches of contract and to modify the business relationships between the parties.[41]

## G.    The Complaint

Plaintiffs filed this action on January 20, 2017.  They assert securities and common law fraud claims against Bedford and Allman and control person liability against all defendants.  Defendants move to dismiss the complaint for failure to plead with particularity and failure to state a claim.

## Discussion

## A.    Pleading Standard

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must allege "sufficient factual matter . . . 'to state a claim to relief that is plausible on its face.'"[42]  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable

---

[39]

No. 16-bk-10429 (SHL), DI 957.

[40]

Complaint at ¶¶ 78, 82; *see also* DI 28-3 (bankruptcy court hearing on June 16, 2016 discussing approval of settlement with United), DI 28-4 (bankruptcy court hearing on November 16, 2016  approving settlement with American).

[41]

Complaint at ¶¶ 78, 81, 83.

[42]

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

inference that the defendant is liable for the misconduct alleged."[43]  The Court reviews a motion to dismiss "accepting all factual allegations in the complaint as true and drawing all reasonable inferences in the plaintiffs' favor."[44]

To plead both common law fraud and fraud under Section 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 thereunder, a complaint must satisfy Rule 9(b)[45] by stating with particularity "the circumstances constituting fraud."[46]  Rule 9(b) requires that a complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."[47]  To state a fraud claim under Section 10(b) and Rule 10b-5, the complaint must satisfy also the Private Securities Litigation Reform Act of 1995 ("PSLRA"), which requires the complaint to "'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.'"[48]

---

[43]

*Id.*

[44]

*Rombach*, 355 F.3d at 169 (quoting *Ganino*, 228 F.3d at 161).

[45]

*ATSI Commc'ns, Inc.*, 493 F.3d at 99 (citing *Ganino*, 228 F.3d at 168).

[46]

Fed. R. Civ. P. 9(b).

[47]

*ATSI Commc'ns, Inc.*, 493 F.3d at 99 (citing *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000)).

[48]

*Id.* (quoting 15 U.S.C. § 78u–4(b)(1)).

B.      *Exchange Act Claims*

1.      *Rule 10(b) and Rule 10b-5 Claims*

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention" of SEC rules and regulations.[49] Rule 10b-5, which was promulgated by the SEC to implement Section 10(b), makes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."[50] To recover for alleged violations of Section 10(b) and Rule 10b-5, a private plaintiff "must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."[51]

a.      *Material Misrepresentations and/or Omissions*

As this Court has stated in the past, "[a] plaintiff who brings a securities fraud claim

---

[49]    15 U.S.C. § 78j(b).

[50]    17 C.F.R. § 240.10b-5(b).

[51]    *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2407 (2014) (quoting *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 460-61 (2013)) (internal quotation marks omitted).

under Section 10(b) and Rule 10b 5 must clear a number of hurdles."[52]  The first requires plaintiffs adequately to allege that defendants made a "material misrepresentation or omission."[53]  As discussed below, in order sufficiently to do so, a plaintiff must plead facts that, if true, would be sufficient to show that the defendant either (1) made "an untrue statement of a material fact," or (2) "omit[ted] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."[54]  A fact will be considered material if "there is a substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell shares [of stock]."[55]

Different issues arise depending on whether a complaint alleges an untrue statement of material fact or a material omission.  A complaint alleging that a defendant made an untrue statement of a material fact must plead facts that, if true, are sufficient to show that the statement

---

[52]

*City of Westland*, 129 F. Supp. 3d at 65-66.

[53]

*Halliburton Co.*, 134 S. Ct. at 2407.

[54]

17 C.F.R. § 240.10b-5(b).

[55]

*Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92-93 (2d Cir. 2010) (quoting *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 518 (2d Cir. 1994)) (internal quotation marks omitted).

"Given that materiality is a mixed question of law and fact, a court should dismiss a complaint on materiality grounds only if the statement or omission is 'so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of [its] importance.'"  *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, No. 12-cv-0256 (LAK), 2016 WL 6652731, at *8 (S.D.N.Y. Nov. 10, 2016) (quoting *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009)).

alleged was "false *at the time it was made*."[56]  To that end, a plaintiff "must do more than simply assert that a statement is false    they must demonstrate with specificity why that is so."[57]

In contrast, a complaint alleging an omission of material fact need not allege falsity. Rather, such a complaint "must plead facts that, if true, would be sufficient to show that the defendant had a duty to disclose the omitted information and failed to do so."[58]  "Such a duty may arise expressly, pursuant to a statute or regulation, or implicitly 'as a result of the ongoing duty to avoid rendering existing statements misleading by failing to disclose material facts.'"[59]

The pleading standard is different yet for a complaint alleging that a statement of opinion constituted an untrue statement of material fact or a material omission.  For a statement of opinion or belief to be actionable as an untrue statement of a material fact, a complaint must plead facts sufficient to show that the defendant "did not hold the belief . . . professed."[60]  To allege adequately that a defendant omitted to state a fact or facts necessary to make a statement of opinion or belief not misleading, a complaint must plead facts that "'call into question the issuer's basis for

---

[56]
    *City of Westland*, 129 F. Supp. 3d at 67 (emphasis in original) (internal quotation marks and citation omitted).

[57]
    *Id.* (quoting *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014) (internal quotation marks omitted) (quoting *Rombach*, 355 F.3d at 174)).

[58]
    *Id.*

[59]
    *Id.* (quoting *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d at 572).

[60]
    *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1327 (2015).

offering the opinion.'"[61] A plaintiff may not do so by "offer[ing] bare 'conclusory allegation[s]' that the issuer 'lacked reasonable grounds for the belief it stated;'"[62] it "'must identify particular (and material) facts going to the basis for the issuer's opinion    facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have    whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.'"[63]

The complaint here alleges that defendants Bedford and/or Allman made material misrepresentations or omissions on eight different occasions, which may be divided into three categories, namely:

*First*, the complaint alleges Bedford made materially false or misleading statements of fact in that he falsely asserted that Republic's Codeshare Partners all had agreed to allow Republic to reduce its flying hours.

*Second*, the complaint alleges Bedford and Allman made materially false or misleading statements in August 2015 by falsely stating that Republic was not in breach of contract.

*Third*, the complaint alleges that Bedford and Allman (1) falsely opined that the breach of contract action brought by Delta was without merit, and (2) failed to disclose Republic's

---

[61]
       *City of Westland*, 129 F. Supp. 3d at 70 (quoting *Omnicare*, 135 S. Ct. at 1332).

[62]
       *Id.* at 71 (quoting *Omnicare*, 135 S. Ct. at 1333).

[63]
       *Id.* at 71-72 (quoting *Omnicare*, 135 S. Ct. at 1332).

potential liability to all three Codeshare Partners in violation of FASB Accounting Standards Codification 450  20 ("ASC 450") and Item 303 of SEC Regulation S-K ("Item 303").[64]

The Court takes each of these points in turn.

## I.    *Agreements with Codeshare Partners*

Plaintiffs allege that Bedford's statements in Republic's first and second quarter Form 10-Qs and during Republic's first quarter earnings call that Republic had reached agreements with its Codeshare Partners were materially false.  Assuming materiality, plaintiffs fail sufficiently to allege falsity as to any of these statements.

First, in the first quarter Form 10-Q, which was filed on May 8, 2015, the company disclosed that it had agreed with its Codeshare Partners to reduce its flying hours to improve its operational performance in the second half of 2015.[65]  Plaintiffs allege, however, only that Delta rejected Republic's proposals to reduce flying hours in January and April 2015 and, in the case of the latter, only with respect to the months of June, July, and August 2015.[66]  These allegations, even if true, would not be sufficient to show that Delta, or any other Codeshare Partner, had not agreed with Republic by May 8, 2015, which is the operative date, to reduce flying hours in the second half of 2015.  As this Court has stated previously:

> "[A] claim for relief must be more than merely possible.  It must be plausible.  Where the well-pleaded facts do not permit the court to infer more than the mere possibility

---

[64]    17 C.F.R. § 229.303.

[65]    Complaint at ¶ 87.

[66]    *Id.* at ¶¶ 56-59.

of misconduct, or where there are obvious alternate explanations, that standard is not met."[67]

Second, during the first quarter earnings call on May 8, 2015, Bedford stated that the company was "getting . . . support" from its Codeshare Partners to reduce Republic's flying levels during the summer of 2015.[68] As discussed above, the allegations that Delta had rejected Republic's proposals in January and April 2015 are insufficient to make out a sufficient basis for the assertion that the statement made in May 2015 was false when it was made. Moreover, just before Bedford made that statement on May 8, 2015, he said that "the most expedient way to get back to our historically high levels of performance is to reach a successful outcome at the bargaining table" and that "*until this happens*, we expect our operational reliability will remain challenged."[69] This statement made clear that, although Republic might have been "getting . . . support" from its partners, it had not yet reached "a successful outcome at the bargaining table." Thus, even if there were not yet deals by May 8, Bedford's statement, taken in context, was not misleading.

Finally, in Republic's second quarter Form 10-Q, filed on August 7, 2015, the company disclosed only that it had "initiated discussions with its [Codeshare] [P]artners to further reduce flying schedules."[70] By the same logic applicable to the first quarter Form 10-Q and earnings call, plaintiffs' allegations as to the falsity of this statement are insufficient.

---

[67] *City of Westland*, 129 F. Supp. 3d at 75 (internal quotation marks and citations omitted).

[68] DI 28-12 at ECF 3.

[69] *Id.* (emphasis added).

[70] Complaint at ¶ 91.

###### ii.  Breach of Contract

Plaintiffs' allegations that the statements made during Republic's second quarter call and in its October 7, 2015 press release that Republic was not in breach of contract were materially false are insufficient as well.

The first set of false statements alleged in this category occurred during Republic's second quarter earnings call on August 7, 2015, when both Bedford and Allman stated that Republic was not in breach of any of its contracts.[71]  Republic issued also a press release on October 7, 2015 which stated, "Republic can confirm that the Company is not in breach of its of its capacity purchase agreements."[72]

As an initial matter, these statements were statements of opinion rather than fact.

Plaintiffs appear to be under the mistaken impression that statements that "are not tempered in any way as expressions of belief" cannot constitute statements of opinion.[73]  But *Omnicare* may not be construed so simplistically.  Whether a statement is a matter of fact is a question of whether the statement sets forth something verifiable.  As this Court has stated previously:

> "If the directors of Company X tell their shareholders that a proposed merger offers a 'fair' price for Company X's shares, they have stated their opinion about the deal. Whether a particular deal is 'fair' is, after all, not a determinate, verifiable statement like 'this ring is 24  carat gold' or 'water boils at 212 degrees Fahrenheit (at standard

---

[71]

*Id.* at ¶ 49.

[72]

*Id.* at ¶ 96 (emphasis omitted).

[73]

DI 31 at 14.

atmospheric pressure).'"[74]

The determination of whether one is in breach of contract ordinarily, or at least often, requires interpreting the contract and, on occasion, determining the application of its terms to fact.[75] Perhaps in the most obvious cases, usually involving very simple contracts, an assertion that a party is not in breach of contract would be a verifiable fact. For example, where a promissory note requires payment on a date certain, breach may depend only on whether the obligor did or did not pay as required. But in many cases, the determination of whether a party is in breach of contract depends on one or more somewhat subjective judgments. For example, a contract may require a party to use its "best efforts" toward some end. A party accused of breach could quite honestly believe that it in fact had used its best efforts even if an adversary or court or jury reasonably might disagree. A party's assertion that it was not in breach of a best efforts clause in those circumstances clearly would be a statement of opinion.

Here, the code share agreements are not before the Court. The Court does not know the terms that allegedly were breached nor any facts upon which any alleged breach rested. That defendants as early as August 2015 anticipated asking the Codeshare Partners for "major concessions" and that Republic had begun negotiating with United to "comprehensively restructure

---

[74]

In re Lehman Bros. Sec. & Erisa Litig., 131 F. Supp. 3d 241, 253 (S.D.N.Y. 2015); see also Tongue v. Sanofi, 816 F.3d 199, 210-11 (2d Cir. 2016) (treating statement by pharmaceutical company that a new drug demonstrated "strong and robust treatment effect" in clinical trial as statement of opinion).

[75]

This is apparent in Bedford's statement during Republic's second quarter earnings call on August 7, 2015. He stated that the company was neither in breach nor in default given his "belie[f] able [sic] to reach consensual understandings with the partners on some operational reductions." Complaint at ¶ 93.

the parties' relationship" in September 2015 do not go to any "inquiry [Bedford or Allman] did or did not conduct or the knowledge [they] did or did not have" with respect to whether the company was in breach of contract as of either August 7, 2015 or October 7, 2015. Hence, plaintiffs have not alleged facts that would permit a finding that Republic's statements were not thought by defendants to be accurate and grounded on an appropriate basis.[76] Yet, it is incumbent on plaintiffs to allege facts that, if true, would show that defendants' statements that Republic was not in breach of contract were bald misstatements of objectively verifiable fact or otherwise actionably misleading.

### iii. Delta Lawsuit

#### (1) Falsity of Statements Pertaining to Merits of Delta Lawsuit

Finally, plaintiffs fail sufficiently to plead falsity with respect to the various statements in which Bedford and Allman opined that the lawsuit filed by Delta was without merit.

The complaint points first to a press release issued on November 4, 2015, which stated, "[w]e believe the allegations [by Delta] are unfounded and without merit"[77] and to

---

[76] Plaintiffs' allegations would be insufficient even if the Court assumed that these statements were of fact. With respect to the allegedly false statements made during the earnings call, beyond Delta's rejection of Republic's proposals in January and April of 2015, the only additional allegation pled in support of falsity is that "as early as August" Republic knew it would need to seek "major concessions" from its Codeshare Partners. *Id.* at ¶ 95. These allegations are insufficiently particularized to plead that the statements made on August 7, 2017 were false.

Similarly, with respect to the October 7, 2015 press release, falsity does not follow from the allegation that Republic informed Delta in August 2015, *i.e.*, as much as one month prior to the statement, that it would not place at two additional ERJ-170 aircraft into service as required by the ERJ-170/175 Agreement. *Id.* at ¶ 97.

[77] *Id.* at ¶ 98.

Republic's third-quarter Form 10-Q filed on November 4, 2015, which was signed by Bedford and Allman and stated that Republic (1) "believe[d] the allegations [by Delta] [were] unfounded and without merit and intend[ed] to pursue [its] rights, remedies and defenses in the litigation," and (2) "dispute[d] the validity of [Delta's] purported extension" of the ERJ-145 Agreement.[78]   Plaintiffs point also to Bedford's declaration, filed on February 25, 2016 in the bankruptcy case, in which he stated that "there was no merit to Delta's lawsuit."[79]

Plaintiffs argue that these statements were materially false and misleading, but they fail to satisfy *Omnicare*.  Plaintiffs' allegation that Republic in August 2015 informed Delta that it would not place at least two additional ERJ-170 aircraft into service does not go to the basis for defendants' opinion in November that the Delta lawsuit and purported contract extension were without merit.

Nor is the Court moved by the allegation that "extensive negotiations" with Delta had begun "over four months before the Company filed for bankruptcy on February 25, 2016."[80]  This allegation is flatly inconsistent with another allegation in the complaint, *viz.*, that Republic's statement with respect to its "extensive negotiations" with Delta was made on March 24, 2016, when Republic moved for approval of its settlement with Delta.[81]  That this statement was made on March

---

[78]

    *Id.* at ¶ 102.

[79]

    *Id.* at ¶ 104.

[80]

    *Id.* at ¶ 99 (internal quotation marks omitted).

[81]

    *Id.* at ¶ 73.

24, 2016 is objectively verified upon review of the docket in the bankruptcy case.[82]  The four-month period preceding March 24, 2016 began on November 24, 2015, well after Republic's alleged misstatements on November 4 and November 5, 2015.

In any event, even if Republic and Delta had begun negotiating before November 4, 2015, it does not follow that a company that attempts to settle litigation necessarily believes the claims it is seeking to resolve by agreement are meritorious.

### (2) Duty to Disclose Under ASC 450 and Item 303

Plaintiffs next argue that "as a result of the extensive negotiations between Republic and Delta that began over four months before the Company filed for bankruptcy on February 25, 2016 . . . , Defendants knew or recklessly disregarded that Republic's potential liability in the Delta Action was significant . . . and included damages for future lost profits."[83]  On that basis, plaintiffs maintain, Bedford and Allman had a duty to disclose these material facts in Republic's third-quarter Form 10-Q pursuant to ASC 450 and Item 303.[84]  Plaintiffs argue also that Republic had an

---

[82]

No. 16-bk-10429 (SHL), DI 244 at 24.

Moreover, with respect to the Delta lawsuit, Bedford stated in his declaration:

"On October 5, 2015, Delta chose abruptly to cease further negotiations with Republic and instead filed litigation against Republic alleging breach of the fixed-fee agreements.  Republic disputed Delta's allegations, and for *approximately six weeks*, there was no further engagement on modifications to their agreements."  No. 16-bk-10429, DI 4 at ¶ 48 (emphasis added).

[83]

*Id.* at ¶ 99 (internal quotation marks omitted).

[84]

*Id.* at ¶¶ 99, 101, 105-111.

additional duty under Item 303 to disclose its exposure to claims by its other Codeshare Partners.[85]

As discussed above, it does not follow from the bankruptcy filings that Republic's "extensive negotiations" with Delta began more than four months before the day on which Republic filed for bankruptcy, but rather more than four months before March 24, 2016. For this reason alone, plaintiffs fail sufficiently to allege that defendants made a material omission when they filed Republic's third-quarter Form 10-Q on November 5, 2015.

Moreover, plaintiffs' allegations that defendants made a material omission would be insufficient even assuming that negotiations with Delta began before November 5, 2015.

ASC 450 provides accounting guidance for the disclosure and accrual of certain loss contingencies.[86] Under ASC 450, a loss contingency must be disclosed if it is reasonably possible; that is, if the likelihood that the event connected to the loss will occur is more than remote but less than likely.[87] Among other factors, a company therefore must consider the "degree of probability of an unfavorable outcome" when determining whether disclosure is required with respect to pending or threatened litigation.[88]

---

[85]

    *Id.* at ¶ 111.

[86]

    A "loss contingency" is "[a]n existing condition, situation, or set of circumstances involving uncertainty as to possible loss to an entity that will ultimately be resolved when one or more future events occur or fail to occur." ASC 450-20-20 (Glossary).

[87]

    ASC 450-20-50-3; ASC 450-20-20. Such disclosure must include the nature of the contingency and an estimate of the possible loss or range of loss (or a statement that such an estimate cannot be made). ASC 450-20-50-4.

[88]

    ASC 450-20-55-10. Factors that go towards the probability of a favorable outcome include: the "nature of the litigation," "progress of the case," "opinions or views of legal counsel," the entity's "experience . . . in similar cases," "the experience of other entities," and "any decision of the entity's management as to how the entity intends to respond to the lawsuit." ASC 450-

The situation is similar with respect to Item 303.  Item 303 requires a company to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations" in the Management's Discussion and Analysis ("MD&A") section of any of its Form 10-K and Form 10-Q filings with the SEC.[89]  But disclosure is necessary only when the uncertainty is "reasonably likely to have material effects on the registrant's financial conditions or results of operations."[90]

Plaintiffs fail sufficiently to allege that defendants thought it was "reasonably possible" or "reasonably likely" that Republic would be found in breach of its code share agreements.  Plaintiffs allege only that Republic had begun negotiations with Delta and United. Even assuming that such negotiations were intended to settle and/or prevent threatened litigation, rather than restructure Republic's relationships with its Codeshare Partners, these allegations do not speak to whether defendants thought that any of the pending or threatened claims was meritorious.

---

[89] 20-55-12.

17 C.F.R. § 229.303(a)(3)(ii).

[90] *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015) (internal quotation marks and citation omitted); *see also Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 95 (2d Cir. 2016) ("Item 303 requires the registrant to disclose only those trends, events, or uncertainties that it actually knows of when it files the relevant report with the SEC. It is not enough that it should have known of the existing trend, event, or uncertainty.").

The Second Circuit has held that Item 303 creates a duty to disclose that is actionable under Section 10(b) of the Exchange Act.  *Stratte-McClure*, 776 F.3d at 101; *see also SAIC, Inc.*, 818 F.3d at 94-97.  The Court notes that the Supreme Court granted *certiorari* as to this question, *Leidos, Inc. v. Ind. Pub. Ret. Sys.*, 137 S. Ct. 1395, 1395-96 (2017), but the case was removed from the oral argument calendar in October 2017 after the parties agreed to a settlement for which they currently are seeking approval in the district court.  *See* Supreme Court docket entry of October 17, 2017, No. 16-581.

Indeed, it would be a leap to say that no party would engage in talks to settle litigation without first believing that the underlying claims likely had merit.

Moreover, with respect to disclosures under Item 303, the company included the following in the MD&A section of its third-quarter Form 10-Q:

> "Primarily as a result of pilot supply constraints caused by industry regulatory changes and the pilot labor dispute between the Company and Local 357, the Company's ability to meet its operational and financial targets in 2015 has been adversely affected. In order to address the effects of its pilot shortage, the Company is working with its CPA partners to reduce levels of flying during the second half of 2015 and beyond. In connection with this effort the Company is seeking to restructure its operational and contractual commitments. *There can be no assurance that these efforts to reach consensual agreements with its stakeholders will be successful or that such agreements will fully restore the Companies operational and financial performance*. . . . We still face several challenges as we rebuild our operation and work to achieve consensual restructuring with our CPA partners and other stakeholders. Without a consensual restructuring we might not have adequate liquidity to fund contractual commitments."[91]

Plaintiffs fail to allege why the emphasized language was not sufficient to alert Republic's shareholders to possible uncertainties in Republic's relationships with its Codeshare Partners.

For the reasons discussed above, plaintiffs have failed to sufficiently allege that defendants Bedford or Allman made an untrue statement of material fact or a material omission. For this reason alone, plaintiffs' claims under Section 10(b) of the Exchange Act and Rule 10b-5 must be dismissed.

---

[91] Republic Airways Holdings Inc., Quarterly Report (Form 10-Q) at 14 (Nov. 5, 2015) (emphasis added).

*b.     Causation*

The foregoing is sufficient to dispose of this case.  But there is an additional ground

as well.

A plaintiff asserting a securities fraud claim must allege and ultimately "prove both

transaction causation . . . and loss causation."[92]  Plaintiffs' claims under Section 10(b) and Rule 10b-

5 fail for the additional reason that the complaint does not adequately allege loss causation.[93]

"Loss causation 'is the causal link between the alleged misconduct and the economic

harm ultimately suffered by the plaintiff.'"[94]  To allege loss causation, a complaint must provide

"'notice of what the relevant economic loss might be and what the causal connection might be

between that loss and the [alleged] misrepresentation.'"[95]  Loss causation may be established "either

by (1) a corrective disclosure or (2) a materialization of a concealed risk."[96]  A plaintiff pleading that

its economic loss was caused by the materialization of a concealed risk "must allege that the loss was

---

[92]

  *ATSI Commc'ns, Inc.*, 493 F.3d at 106 (quoting *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 172 (2d Cir. 2005)).

[93]

  It is undisputed that plaintiffs have sufficiently pled transaction causation.  "Transaction causation is akin to reliance, and requires only an allegation that 'but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction.'" *Lentell*, 396 F.3d at 172 (quoting *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003)).  The complaint alleges that Axar and Man GLG each relied on defendants' alleged material misstatements and omissions in purchasing over 10 million and 3.1 million Republic shares, respectively.

[94]

  *Id.* (quoting *Emergent Capital Inv. Mgmt., LLC*, 343 F.3d at 197).

[95]

  *Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 620 (S.D.N.Y. 2015) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)).

[96]

  *In re Lehman Bros. Sec. & Erisa Litig.*, 799 F. Supp. 2d 258, 304 (S.D.N.Y. 2011) (footnote omitted).

(1) foreseeable and (2) caused by the materialization of the concealed risk."[97]   In other words:

> "'[A] plaintiff must allege . . . that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered,' *Suez Equity Investors, L.P. v. Toronto Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001) (emphasis added), *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security. Otherwise, the loss in question was not foreseeable."[98]

Plaintiffs' theory of causation is that defendants' alleged material misstatements and omissions concealed a foreseeable risk that Republic's purported equity value of $590 million as of January 31, 2016 would be offset by claims in the bankruptcy case.  The foreseeable risk supposedly materialized with Republic's settlements with its Codeshare Partners, which significantly diluted plaintiffs' investments in Republic.  But the theory is not sufficient.

Plaintiffs fail to allege that the three settlements caused them to receive less under Republic's Chapter 11 reorganization plan than they would have received in the absence of the settlements as to the Codeshare Partners.[99]   Another judge of this court concluded as much when she rejected plaintiffs' objections to Republic's settlement with Delta, stating that it was "not at all clear" that plaintiffs "[would] not receive something that they would otherwise receive by virtue of this

---

[97]   *Id.* (footnote omitted).

[98]   *Lentell*, 396 F.3d at 173.

[99]   Republic did not file a plan of reorganization in the bankruptcy case until after all three settlements with its Codeshare Partners had been approved.  *See* No. 16-bk-10429-SHL, DI 1190 (Disclosure Statement filed on November 16, 2016); DI 1278 (First Amended Disclosure Statement filed on December 12, 2016); DI 1312 (Second Amended Disclosure Statement filed on December 19, 2016).

settlement."[100] She continued:

> "The only way that this settlement would impact [plaintiffs] would be if, in the absence of the additional $170 million allowed unsecured claim, [Republic's] valuation indicates that there is hope for some recovery by the equity holders. But they cannot make such a showing and have not even tried. In fact, they have no idea whether [Republic] is already sufficiently under water that even in the absence of this settlement they would never stand to recover a penny."[101]

Plaintiffs similarly fail to allege such facts here. Plaintiffs' theory essentially is that their proportional share of equity has been diluted by the recognition of settlements that authorize Republic to grant unsecured claims to its Codeshare Partners. But the Codeshare Partners are unsecured creditors. They stand behind senior creditors. Plaintiffs fail to allege that they will receive even one cent less than they would have received had Republic not entered into the settlements. Accordingly, on this additional basis, plaintiffs claims of securities fraud under Section 10(b) and Rule 10b-5 must be dismissed.

2.    *Section 20(a) Claims*

As plaintiffs have failed to allege a primary violation of securities fraud, their control person claims must be dismissed as well.

C.    *Common Law Fraud Claims*

Plaintiffs' common law fraud claims must be dismissed as well. As this Court has

---

[100]

*In re Republic Airways Holdings Inc.*, No. 16-cv-3315 (KBF), 2016 WL 2621990, at *2 (S.D.N.Y. May 6, 2016).

[101]

*Id.*

stated previously:

> "The elements of common law fraud . . . are largely the same as those of a Rule 10b–5 claim except that there is no requirement that the fraud be in connection with the purchase or sale of securities. In other words, a claim for common law fraud is available to investors who retain their securities in reliance on a defendant's misrepresentations."[102]

In other words, plaintiffs would have an alternative theory of injury open to them on their common law fraud claims, *i.e.* that they retained their shares in Republic in reliance on the alleged misrepresentations. Nonetheless, Axar and Man GLG do not plead any facts that would suffice to invoke that theory. They allege simply that they would not have purchased common stock had they known the facts regarding Republic's potential liability in the Delta action. In any event, for the same reasons that plaintiffs' Section 10(b) and Rule 10b-5 claims fail, plaintiffs claims of common law fraud fail as well.

## Conclusion

For the foregoing reasons, defendants' motion to dismiss the complaint [DI 26] is granted.

SO ORDERED.

Dated:     March 29, 2018

_____
Lewis A. Kaplan
United States District Judge

---

[102] *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*, 376 F. Supp. 2d 385, 407 (S.D.N.Y. 2005) (footnotes and citations omitted).